## LITCHFIELD *v.* COUNTY OF WEBSTER.

## COUNTY OF WEBSTER *v.* LITCHFIELD.

1. *Wolsey* v. *Chapman* (*supra*, p. 755) reaffirmed.
2. This court adhering to the construction given by the Supreme Court of Iowa to the revenue laws of that State touching the time when lands located or entered under the laws of the United States, or purchased from the State, become taxable, *holds* that the lands, the title whereto by the joint resolution of Congress approved March 2, 1861 (12 Stat. 251), passed to *bona fide* purchasers of that State, were not subject to taxation prior to the year 1862.
3. Where the State claimed adversely to the true owner a part of said lands, and there was a controversy whether the title to the remainder had passed from the United States, and, on that account, the proper authorities of the State gave notice to the parties in interest that no legal steps would be taken to enforce the collection of the taxes until the title should be adjusted, — *Held*, that the statutory interest, which is in the nature of a penalty, cannot be exacted for non-payment of them within the time prescribed by law, where the owner, on the adjustment of the title, offered to pay so much of them as was actually due, with interest thereon at the rate allowed by law for delay in the payment of ordinary debts, and his offer was refused.
4. A court of equity has, under such circumstances, the power to grant relief by enjoining the collection of such statutory interest.

APPEALS from the Circuit Court of the United States for the District of Iowa.

Litchfield filed, Sept. 29, 1873, his bill of complaint against the county of Webster, Iowa, and Hutchinson, its treasurer, seeking to enjoin the collection of the taxes levied for 1859, 1860, 1861, 1862, 1863, 1864, 1865, and 1866 on lands whereof he claimed to be the owner. They amount to $32,602\frac{92}{100}$ acres, and are situate in that county in the alternate odd-numbered sections, within five miles of that part of the Des Moines River which is above the Raccoon Fork.

The principal of the taxes, when the case was submitted to the court below, was $10,174.76, and the penalty claimed for the non-payment of them, $64,235.41, making a total of $74,410.17.

These lands are a portion of those, which gave rise to a long protracted controversy, of which *Wolsey* v. *Chapman* (*supra*, p. 755) furnishes a complete history.

The facts which this suit involves are stated with sufficient fulness in the opinion of the court.

The court below, considering the penalties prescribed by the revenue laws of Iowa, as in the nature of interest rather than as statutory penalties proper, held that the complainant, by reason of the acts of the State and its officers, was entitled to relief upon his paying the full amount of taxes from 1862 to 1866 inclusive, with annual interest thereon at the rate of six per cent; and that the lands were not subject to taxation for the preceding years. A decree was entered accordingly, and each party appealed.

*Mr. George G. Wright* for Litchfield.
*Mr. John F. Duncombe, contra.*

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

The primary question to be decided in this case is as to the time when the lands which passed to the *bona fide* purchasers from the State of Iowa under the joint resolution of Congress approved March 2, 1861 (12 Stat. 251), became taxable by the laws of the State. The controversy is about taxes assessed for the years 1859, 1860, 1861, 1862, 1863, 1864, 1865, and 1866.

The facts affecting the title are fully stated in *Wolsey* v. *Chapman* (*supra*, p. 755), where we held, following the principles settled in *Dubuque & Pacific Railroad Co.* v. *Litchfield* (23 How. 66), *Wolcott* v. *Des Moines Company* (5 Wall. 681), *Riley* v. *Wells,* not reported, *Williams* v. *Baker* (17 Wall. 144), and *Homestead Company* v. *Valley Railroad* (id. 153), that the United States continued to own the lands until the adoption of the joint resolution. No lands were included in the original river grant of 1846, except those below the Raccoon Fork. While on account of the action of the Executive Department of the general government those above the Fork were reserved from sale and did not pass to the State when selected as school lands under the act of 1841, or as railroad lands by the grant of 1856, and were not open to pre-emption entry, they were not actually donated by the United States to the State, or to the purchasers from her, until the joint resolution was adopted. The grant made by that resolution was just as much an original grant as if the act of 1846 had never

been passed. The order of the Executive Department, reserving them from sale, neither transferred any title to, nor created any interest in, the State. It simply retained the ownership in the United States. While the subsequent gift was undoubtedly induced by what had happened before, the United States, until it was made, continued to be the proprietor of the lands, both in law and in equity. Such being the case, they were not taxable before March 2, 1861. They, down to that time, actually belonged to the United States, and no one else had any interest whatever in them.

This disposes of the taxes for the years 1859 and 1860, but another question arises as to those of 1861. Under the revenue laws of Iowa, in force at that time, government lands entered or located, or lands purchased from the State, could not be taxed for the year in which the entry, location, or purchase was made. Laws of Iowa, Rev. 1860, p. 110, sect. 711, par. 7. In *The McGregor & M. Railroad Co.* v. *Brown* (39 Iowa, 655), this was held to mean that government lands were not taxable until the next year after a patent could be demanded for them. To the same general effect are *Iowa Falls & Sioux City Railroad* v. *Cherokee County*, 37 Iowa, 483; *Goodrich* v. *Beaman*, id. 563; *Iowa Falls & Sioux City Railroad* v. *Woodbury County*, 38 id. 498. The revenue year of the State for 1861 commenced before March. It is clear, therefore, that the lands were not taxable for that year. They were neither entered, located, purchased from the State, nor patented, within the meaning of the revenue laws, until then.

We think, however, that for the year 1862 and thereafter they were taxable. By the joint resolution, Congress relinquished all the title the United States then retained to the lands which had before that time been certified by the Department of the Interior as part of the river grant, and which were held by *bona fide* purchasers under the State. No further conveyance was necessary to complete the transfer, and the description was sufficient to identify the property. The title thus relinquished inured at once to the benefit of the purchasers for whose use the relinquishment was made. All the lands involved in this suit had been certified, and Litchfield, or those under whom he claims, were *bona fide* purchasers from

the State. It matters not, so far as this branch of the case is concerned, that at that time there were doubts as to whether the United States retained any title which could pass under the resolution. That question has now been settled in favor of Litchfield, and it has also been decided that after the resolution went into effect the United States had no longer any interest in the property, legal or equitable. It became private property, and as such subject to taxation under the revenue laws of the State.

It only remains to consider whether, under the circumstances of this case, it is within the power of a court of equity to enjoin the collection of the interest or penalty which the revenue laws of the State require the treasurer of the county to collect in case taxes legally assessed are not paid within the time fixed by law. The statutes regulating this matter are as follows : —

" SECT. 759. On the first day of February, the unpaid taxes, of whatever description, for the preceding year shall become delinquent, and shall draw interest, as hereinafter provided; . . .

" SECT. 760. The treasurer shall continue to receive taxes after they have become delinquent, until collected by distress and sale ; but if they are not paid before the 1st of March, he shall collect as a penalty for non-payment, from each tax-payer so delinquent, one per cent of the amount of his tax additional, and if not paid before the first day of April, he shall collect another one per cent additional, and so for each full month which shall expire before the tax shall have been paid. The treasurer shall, in all cases, make out and deliver to the tax-payer a receipt for taxes paid, stating the time of payment, the description of the land, the amount of each kind of tax, the interest on each, and costs, if any, giving a separate receipt for each year; and shall make the proper entries of such payments in the books of his office, and such receipt shall be in full for his taxes that year; . . ."

By sect. 761 the clerk of the county board of supervisors is required to keep full and complete accounts with the county treasurer, and, among other things, to charge him with " interest on delinquent taxes," and " on the first day of each month ascertain the amount of delinquent and unpaid taxes of all classes on said day, and charge said treasurer in said account

with one per cent on the amount thereof to be collected by him, as provided in sect. 52 [sect. 760] of this act." Laws of Iowa, Rev. 1860, pp. 118, 119. On the first day of October in each year the treasurer is required to offer at public sale all the lands on which the taxes for the previous year had not been paid. Of this sale notice was to be given by advertisement. Sect. 763, p. 119.

It appears from the agreed statement of the parties that the lands about which this controversy arises amount in the aggregate to $32,602\frac{92}{100}$ acres. Of this, 3,301 acres are part of the school lands selected by the State under the act of 1841, the particulars of which appear in *Wolsey* v. *Chapman* (*supra*), and about 17,000 acres fall within the limits of the railroad grant of 1856, also referred to in that case. In respect to the school lands, it appears that the State has at all times claimed title adverse to that of Litchfield and his grantors. In the adjustment of the controversies with the United States, as was seen in that case, the agent acting on behalf of the State was specifically required not to relinquish any claim of the State to its selections under the act of 1841; and even at the present term of this court the State has appeared here as a litigant, asserting its own title and that of its grantees as superior and paramount to that of Litchfield.

As to the railroad grant of 1856, the agreed statement shows that on the demand of the State the 17,000 acres now in controversy were certified for the benefit of the Dubuque and Pacific Railroad Company. This claim on the part of the State was maintained and constantly asserted adversely to Litchfield until the case of *Wolcott* v. *Des Moines Company* (5 Wall. 681) was decided in this court at the December Term, 1866. That decision settled the dispute as to these lands, and from that time Litchfield has paid all taxes as they were annually assessed.

The State has never claimed adversely to Litchfield any portion of the remaining 12,000 acres, but the United States maintained that the title did not pass by the joint resolution of March 2, 1861, so as to cut off pre-emption and homestead entries. That question remained open until the December Term, 1869, of this court, when it was settled in the case of *Riley* v.

*Wells.* Until then, or, at least, until the adjustment between the United States and the State, in 1866, the title of the navigation company and its grantees to this portion of its lands was disputed by the United States, and sales conflicting with those of the navigation company were made at the government land-offices.

On the 21st of September, 1860, the treasurer and recorder of Webster County wrote to the agent of the navigation company, the grantor of Litchfield, to the effect that the lands were on the tax-book, but that until the title was adjusted they would not be advertised for sale. Before that time, on the 14th of June, 1860, the auditor of state wrote the auditors of the several counties in which the disputed lands were situated, as follows:—

" We conclude, in view of the so-called river lands, and the further question as to their being liable to tax, that it would be well not to offer them for sale for the taxes until these matters are determined or adjusted in some manner. There are two questions in regard to them. Firstly, has the State any title to them under the river grant? which it is reported has been decided in the negative, but of which we have no official information; 2d, whether they are taxable prior to 1859 as the property of the river company or their grantees. The last question I thought had been decided by our courts, but learn from Attorney-General Rice that there is some doubt about it. Upon the whole, it is thought best not to sell at present, lest it may lead to unnecessary trouble and expense."

It also appears from the statement of facts that during the years 1863, 1864, 1865, and 1866 the taxes charged against the property were in some particulars in excess of what the law allowed. No person was designated on the tax-book as owner. Any one could pay the taxes and get a receipt. If one of the contesting claimants paid them supposing the lands were his, he could not, if he finally failed to maintain his title, recover from the real owner what he thus advanced. We so held in *Homestead Company* v. *Valley Railroad*, 17 Wall. 153.

It thus appears that while Litchfield or his grantor was in reality the owner of the lands from 1862 to 1866, and bound

to pay the taxes for those years as assessed, the State, from which the taxing power came, disputed his title and set up an adverse claim in its own right to something more than 20,000 acres. At the same time, the United States disputed his ownership of the remaining 12,000 acres. All this was known to the State authorities, and in view of the facts the State, by its proper officer, gave notice to the parties in interest that the lands would be put on the annual tax-books and charged with the taxes the owner should pay, if the title had passed out of the United States or the State, in law or in equity, but that, to avoid " unnecessary trouble and expense," no legal steps would be taken to enforce the collection "until the title was adjusted." This we understand to be the legal effect of the instructions of the auditor of state to the treasurers of the several counties in which the disputed lands were situated, and the communication from the treasurer of Webster County to the agent of the navigation company, made while the tax-books of 1859 and 1860 were in his hands for collection. As soon as the title was adjusted, and even before, Litchfield or those under whom he claims commenced the payment of the annual taxes as they fell due, and offered to pay those of 1862, 1863, 1864, 1865, and 1866, with interest at the rate allowed by law for delay in the payment of ordinary debts ; but the treasurer declined to receive less than the statutory interest or penalty, unless the taxes of 1859, 1860, and 1861 were included. Although the lands were advertised for sale in 1862 and annually thereafter, they were purposely withheld from sale until this suit was commenced.

Under these circumstances, we think equity may relieve against that part of the statutory interest which is in the nature of a penalty. This provision was undoubtedly made to secure promptness in the payment of taxes when actually due and demandable. It was evidently not intended so much as punishment for non-payment as compensation for delay. In all parts of the statute, except sect. 760, it is spoken of as interest. In one place in that section it is termed a penalty, but in another referred to as interest. The amount increases as the time of payment is put off. Now it seems clear to us that if a State, under whose authority a tax is levied, sets up a title

in itself to the property taxed adverse to that of the true owner, and, to save "unnecessary trouble and expense," forbears to enforce the collection until the "title is adjusted," no claim can properly be made for extraordinary compensation on account of a delay in payment of the tax which may fairly be said to have been brought about by its own wrongful acts. Under the circumstances, Litchfield and his grantor might well have supposed that the taxes as charged were not to be treated as "delinquent," until in some form it had been determined whether the lands taxed were in law taxable. It now appears that the adverse claims of the State and the United States were unjust, and that Litchfield is bound for the payment of the taxes of 1862 and thereafter. He, therefore, actually owes the money called for by the taxes, and may properly be charged with such interest after the taxes became due as is by law payable on other money obligations; but the extraordinary compensation given by the statute for delay in payment of taxes charged on the tax-books, and in the regular process of collection, occupies a different position. It is an elementary principle in equity jurisprudence, that if money is lying dead to meet an obligation, and delay in its payment is caused by the fault of him to whom it is to be paid, interest during the delay is not recoverable. Here the delay was caused by the improper interference of the State and the United States with the title. Litchfield himself has been guilty of no fraud or wilful default. The State has voluntarily abstained from enforcing the collection because of doubts about its right to do so, and Litchfield has had the use of his money while the dispute remained unsettled. As soon as the title was adjusted he offered to pay what was actually due, with ordinary interest; and this was refused. Under these circumstances, we think the court below was right in enjoining the collection of all penalty or interest in excess of six per cent per annum. In *Stryker* v. *Polk County* (22 Iowa, 137), there is a strong intimation that in a case like this such relief might be granted. None of the objections which were found to granting the injunction asked for in that case exist here, and it is clearly made to appear that the action of the State affected the title of this plaintiff prejudicially. Such a case was made by the bill, and established by the evi-

dence.   It may fairly be inferred from what is said in *Litch-field* v. *County of Hamilton* (40 Iowa, 66), that in such a case the courts of the State would afford the remedy.

Although taxes in Iowa are levied and collected by the counties, all is done under the authority of the State, and the counties are charged with whatever is done by the State affecting the rights of the tax-payer.   No complaint is made by Litchfield of the amount found due from him by the court below, if the decree is in other respects right, as we find it to be.

*Decree affirmed, each party to pay the costs of his own appeal.*

NOTE. — In *Litchfield* v. *County of Hamilton*, error to the Supreme Court of the State of Iowa, which was submitted on printed arguments by *Mr. George G. Wright* for the plaintiff in error, and by *Mr. Daniel D. Chase* for the defendants in error,

MR. CHIEF JUSTICE WAITE, in delivering the opinion of the court, remarked, that the only Federal question presented was whether the lands in Hamilton County, which Litchfield held by the same title he did those in Webster County, involved in the preceding case, were taxable for the years 1859, 1860, 1861, 1862, 1863, 1864, and 1865.   For the reasons stated in the other case, the court held that the taxes for 1859, 1860, and 1861 were illegal, and their collection should be enjoined, but that those for 1862 and the following years were properly collectible.   The court below decided that they were legally assessed for all the years, and decreed that they be paid in full, with all interest, penalties, and costs.   The liability of Litchfield for interest and penalties after 1861 did not present any Federal question.

The decree of the State court was reversed, and the cause remanded with directions to enjoin the collection of all taxes and charges on the lands in question for the years 1859, 1860, and 1861, but with leave to enter such further decree in reference to the taxes of 1862 and thereafter as the court should be advised might be proper under the circumstances.