## MILLS v. GREEN.

### (Circuit Court, D. South Carolina. May 8, 1895.)

1. CONSTITUTIONAL LAW—SUIT AGAINST A STATE.

A suit, brought by a citizen of the United States against the supervisor of registration of a state, charged, under the state statutes, with the duty of superintending the registration of voters, to restrain him from carrying out the provisions of such statutes, on the ground that they violate the constitutions of the state and of the United States, is not a suit against the state.

2. SAME—AMENDMENTS 14 AND 15—JURISDICTION OF UNITED STATES COURTS.

The leading purpose in the adoption of the fourteenth and fifteenth amendments to the constitution of the United States was to secure to persons of African descent the full enjoyment of the privileges of citizenship, including the right to vote; and the courts of the United States have jurisdiction of a suit by such a person against officers of a state to restrain them from acting under a statute of such state, claimed to violate said amendments to the constitution by abridging or denying such privileges.

3. SAME—REGISTRATION LAWS—SOUTH CAROLINA STATUTE.

The constitution of South Carolina provides (article 1, § 31) that all elections shall be free and open, and every inhabitant possessing the constitutional qualifications shall have equal right to elect and be elected; (article 8, § 2) that every male citizen of the United States, 21 years of age, who was a resident at the adoption of the constitution, or who resides in the state one year and in the county where he offers to vote sixty days before an election, shall be entitled to vote; (article 8, § 3) that the general assembly shall provide for registration of electors; and (article 8, § 8) that the general assembly shall never pass any law which will deprive any citizen of the right of suffrage, except for crime. The statutes relating to registration of voters (Gen. St. 1882, § 90, etc.) provide that in 1882 a registration of voters should be made, and the registration books closed; that thereafter such books should be open once a month after the general election in each year, until the 1st of July preceding each general election (usually held in November). for the registration of persons thereafter becoming entitled to vote; that, after the closing of the books in each year, persons coming of age before the election might be registered; and that, upon the registration of any voter a certificate of registration should be given him, without the production of which he should not be allowed to vote, and which, upon removal from one county to another, must be transferred and renewed under onerous conditions. An act passed in 1894, providing for the election of members of a constitutional convention, also provided that a person not registered in 1882, or at a subsequent time when he would have had a right to register, might, within a certain time, register, upon making affidavit, supported by that of two respectable citizens, as to various particulars of his occupation and residence at the time he might have registered and thereafter. *Held,* that these provisions of the statutes were an unreasonable restriction of the right of suffrage, manifestly designed to prevent the exercise of that right by ignorant persons, especially of the African race. and were a violation of the constitution of the state and of the fourteenth and fifteenth amendments to the constitution of the United States.

This was a suit by Lawrence P. Mills against W. Briggs Green to restrain the defendant individually and as supervisor of registration for Richland county, S. C., from performing certain acts under the registration laws of the state. The complainant moved for a preliminary injunction. Granted.

Obear & Douglass, for complainant.

Wm. A. Barber, Atty. Gen., C. P. Townsend, Asst. Atty. Gen., George S. Mower, and Edward McCrady, for defendant.

GOFF, Circuit Judge. On the 20th day of April last, on consideration of the bill in this cause, I passed an order that the defendant, W. Briggs Green, individually and as supervisor of registration for Richland county, in the state of South Carolina, be enjoined and restrained until the further order of this court from the commission of the acts complained of in complainant's bill, and I directed that said defendant show cause before me, if any he could, at Columbia, S. C., on Thursday, May 2d inst., why such order should not be continued, or some order of like purport and effect be then granted, enjoining and restraining him both individually and as such supervisor of registration from the commission of said acts, until the final hearing and determination of this cause.

The plaintiff, a citizen of the state of South Carolina and of the United States, brings this suit against W. Briggs Green, a citizen

of said state and of the United States.    The plaintiff exhibits his bill in his own behalf and for all others, citizens of the county of Richland, in the state of South Carolina, circumstanced like him, who are too numerous to be named, and made parties hereto. It is set forth in the bill:   That the plaintiff was 26 years of age on the 4th day of February, 1895.    That he is a resident of Ward 4, precinct of Columbia, in said county and state.    That he is a male citizen of the United States.    That he has resided in the state of South Carolina for more than 1 year preceding the last general election in that state, and in the county of Richland for more than 60 days prior to said general election.    That he is an elector of the state of South Carolina, possessing all of the qualifications of an elector of the most numerous branch of the state legislature, and is subject to none of the disqualifications set forth in the constitution of that state; and that he is, under the constitution and laws of the United States, duly qualified to vote at all federal and state elections held in said ward, county, and state.    It is also set forth in the bill:   That section 90 of the General Statutes of South Carolina of 1882 provides as follows:

"All electors of the state shall be registered as hereinafter provided; and no person shall be allowed to vote at any election hereafter to be held unless registered as hereinafter required."

### That by section 94 of said statutes it is provided:

"When the said registration (in certain books to be provided for and made in the manner provided for in section 93) shall have been completed, the books shall be closed, and not opened for registration, except for the purpose and as hereinafter mentioned, until after the next general election for state officers.  After the said next general election the books shall be opened for registration of such persons as shall thereafter become entitled to register, on the first Monday in each month, to and until the first Monday in July, inclusive, preceding the following general election, upon which last named day the same shall be closed and not re-opened for registration until after the said general election, and that thereafter the said books shall be opened for the registration of such electors, on the days above mentioned, until the first day of July preceding a general election, when the same shall be closed as aforesaid until the said general election shall have taken place."

### That in section 137 of Revised Statutes it is provided:

"After every general election the registration books shall be opened for registration of such persons as shall thereafter become entitled to register, on the first Monday in each month until the first day of July preceding a general election when the same shall be closed until such election shall have taken place."

### That section 97, Gen. St., provides:

"Any person coming of age, and being qualified as an elector, may appear before the supervisor of registration, on any day on which the books are opened as aforesaid and take oath as to his age and qualifications as hereinbefore provided, and if the supervisor find him qualified he shall enter his name upon the registration book of the precinct wherein he resides."

It is also alleged that said registration laws provide that the supervisors of registration in the several counties shall issue to the voter, when registered, a certificate of registration, and that said voter shall

present the same at the polls to the managers of the election, and that no one shall be allowed to vote at any election to be held in said state unless his certificate of registration is exhibited when he offers to vote; and that it is required by said law that, in case a voter shall remove from one county to another in said state, or from one precinct to another in the same county, or from one residence to another in the same precinct, he shall obtain a transfer and a renewal certificate; and that, should a voter lose his certificate, he must obtain a renewal thereof, upon furnishing evidence satisfactory to the registrar of the county wherein he resides that his certificate has been mislaid or lost, and that the same has not been willfully or intentionally disposed of. The bill also alleges that by the provisions and requirements of said enactment the voter failing for any reason to comply with any of the provisions of the same is denied the right of suffrage both in federal and state elections. Complainant claims that the provisions of the said enactments fixing the time for registration and the closing of the books for that purpose on the 1st day of July preceding every election, and the many requirements and conditions set out in the various sections of said registration law, were intended, and that they in effect do, abridge, impede, and destroy the suffrage of the citizens, both of the state and of the United States. It is also averred that on the 24th day of December, 1894, an act was passed by the general assembly of South Carolina entitled "An act to provide for calling a constitutional convention, to provide the number and qualifications of members of the convention, their compensation, etc., and to provide for the election of the same, and to define and prescribe the qualifications of the electors, and the manner of the election and of declaring the result"; that by section 4 of said act it is declared who shall be entitled to vote for delegates to said constitutional convention; and that, in addition to the qualifications prescribed for electors by the constitution of the state of South Carolina, is provided a further one, viz. "that the elector be duly registered as now required by law, or who, having been entitled to register as a voter at the time of the general registration of electors in the state which took place in the year 1882, or at any time subsequent thereto, failed to register at such time, or who has become a citizen of this state, and who shall register as hereinafter provided in such cases." Other provisions of the laws and of the constitution of the state of South Carolina are set forth, but I do not deem it necessary to now recite them. The bill charges that W. Briggs Green has been appointed to the office of supervisor of registration for Richland county, in pursuance of said registration laws; that he is now exercising the duties prescribed by the same, and that he intends to continue so to act, and that he intends to furnish to the several boards of managers for the precinct in which plaintiff resides, in said county, who hold the election of delegates to said constitutional convention, certain paper writings purporting to be registration books for use at such precinct.

The complainant says that he failed to register at the registration made after the general election of 1888, and during the 10 days in March, 1895, provided for in the act of 1894, because, although he

made repeated and persistent efforts to become registered, he found himself unable to comply with the unreasonable, unnecessary, and burdensome rules, regulations, and restrictions prescribed by said unconstitutional registration laws as conditions precedent to his right to register, and that he has never been allowed to vote at any federal or state election of the state of South Carolina; that he is desirous of voting for delegates to the said constitutional convention, and that the paper writings purporting to be books of registration, now in the hands of the defendant, do not and will not contain his name as a registered voter for the reason before stated; that he and others like circumstanced with him will not be permitted to vote at said special election by the managers thereof unless their names be found upon the·books of registration, and they produce the registration certificate mentioned; and that, if the defendant be permitted to continue the aforesaid illegal, partial, and void registration, and be allowed to turn over to the managers of such election for the county of Richland the books of registration for said county, he, the plaintiff, will be deprived of his right to vote at said election, and *grievous and irreparable wrong and damages will be done him,* which can only be prevented by the interposition of this court by way of restraining the defendant from the performance of said before-mentioned acts.

The defendant, in his return to the rule to show cause, insists that, as supervisor of registration for Richland county, he is not answerable to the jurisdiction of this court, and that the matters, facts, and things alleged and complained of in the bill are matters relating to the political duties of his office; that this is in effect a suit against the state of South Carolina, which is prohibited by the eleventh amendment of the constitution of the United States. Also that the bill presents no questions arising under the constitution or laws of the United States and that this court has no jurisdiction of the case; that the bill presents no case for equity jurisdiction, as the plaintiff has a plain and adequate remedy at law; that the bill is multifarious, and not properly verified. He denies that the registration laws were intended, and that they in effect do, abridge, impede, and destroy the suffrage of the citizens of the state and of the United States, and he claims that they are reasonable and constitutional, and submits their proper construction to the court. The other matters set up in the return will not now be recited, but will be considered in substance as the questions arising are disposed of.

The question of jurisdiction is first to be determined. Defendant insists that this suit is, in effect, a proceeding against the state of South Carolina, and that it should not be entertained, because prohibited by the eleventh amendment to the constitution of the United States. It is not my intention at this time to consider separately the many cases cited by counsel in argument, bearing on this question. After carefully examining them all, I conclude that it is the duty of the circuit court of the United States to restrain a state officer from exercising an unconstitutional statute of the state, when the execution of it by him would violate or abridge the rights, privileges, and immunities of the complainant that are guaranteed by the

constitution of the United States. So far as this question is concerned, it is immaterial if the officer so restrained be the supervisor of registration, the auditor of state, the comptroller general, the treasurer, the attorney general, or the governor. We do not have, in this country, any class of people, state or national officials or private citizens, who are above the law, and who are not compelled to respect it. The constitution of the United States is the supreme law of the land, anything in the constitution or laws of any of the states to the contrary notwithstanding. The mandate of the nation's constitution is addressed to all officers of the United States as well as to all the officers of all the states. The judges of the state as well as of the federal courts must respect it, for it declares "that the judges of every state shall be bound thereby." As is said by the supreme court, in Dodge v. Woolsey, 18 How. 331:

"'To make, its supremacy more complete, impressive, and practical, that there should be no escape from its operation, and that its binding force upon the states and the members of congress should be unmistakable, it is declared that the senators and representatives, before mentioned, and the members of the several state legislatures, and all executive and judicial officers, both of the United States and of the several states, shall be bound by oath or affirmation to support this constitution."

It would be a strange admission—a startling decision—that the courts of the United States cannot open their doors to the citizens of the United States, who allege that they are, by the unconstitutional laws of a state, deprived of their privileges or immunities as citizens of the United States, and denied the equal protection of the laws within the jurisdiction of such state. I am not aware that any court of the United States has ever so held. I trust I will never be advised of such a decision, and I am sure, as I now see the law and my duty, that I will not so rule; not establish such a precedent.

The case of In re Ayers, 123 U. S. 443, 8 Sup. Ct. 164, relied on by defendant's counsel, does not, in my judgment, sustain the position taken by them. In that case the jurisdiction of the circuit court was denied, not because the officers of the state were sued, but because the court found that the act of the legislature complained of did not violate any contract, and because the bill did not allege any ground of equitable relief against the individual defendants for any personal wrong committed or threatened by them; because it did not charge against them in their individual character anything done or threatened which constituted, in contemplation of law, a violation of personal or property rights, or a breach of contract to which they were parties. In these particulars the Ayers Case differs materially from the case now before me. In that case the supreme court says:

"But this is not intended in any way to impinge upon the principle which justifies suits against individual defendants, who, under color of the authority of unconstitutional legislation by the state, are guilty of personal trespasses and wrongs, nor to forbid suits against officers in their official capacity either to arrest or direct their official action by injunction or mandamus, where such suits are authorized by law, and the act to be done or omitted is purely ministerial, in the performance or omission of which the plaintiff has a legal interest."

In Davis v. Gray, 16 Wall. 203, the supreme court held that a circuit court of the United States, in a proper case in equity, may enjoin a state officer from executing a state law in conflict with the constitution or a statute of the United States when such execution will violate the rights of the complainant; that making a state officer a party does not make the state a party, although her law may prompt his action, and she may stand behind him as the real party in interest. That case was a suit by Gray against Davis, the governor of the state of Texas; and Keuchler, commissioner of the land office of that state; and the injunction issued by the circuit court of the United States for the Western district of Texas, restraining said officers from issuing and signing certain land warrants, was sustained, as I have mentioned, by the supreme court of the United States.

In the case of Pennoyer v. McConnaughy, 140 U. S. 1, 11 Sup. Ct. 699, in which the supreme court reviewed the cases bearing on this subject, Mr. Justice Lamar, speaking for the court, said:

"But the general doctrine of Osborn v. Bank [9 Wheat. 738], that the circuit courts of the United States will restrain a state officer from executing an unconstitutional statute of the state when to execute it would violate rights and privileges of the complainant which had been guaranteed by the constitution, and would work irreparable damage and injury to him, has never been departed from. On the contrary, the principles of that case have been recognized and enforced in a very large number of cases, notably in those we have referred to as belonging to the second class of cases above mentioned."

In the case just referred to he also used this language:

"The first class is where the suit is brought against the officers of the state as representing the state's action and liability, thus making it, though not a party to the record, the real party against which the judgment will so operate as to compel it to specifically perform its contracts. In re Ayers, 123 U. S. 443, 8 Sup. Ct. 164; Louisiana v. Jumel, 107 U. S. 711, 2 Sup. Ct. 128; Antoni v. Greenhow, 107 U. S. 769, 2 Sup. Ct. 91; Cunningham v. Railroad Co., 109 U. S. 446, 3 Sup. Ct. 292, 609; Hagood v. Southern, 117 U. S. 52, 6 Sup. Ct. 608. The other class is where a suit is brought against defendants who, claiming to act as officers of the state, under the color of an unconstitutional statute, commit acts of wrong and injury to the rights and property of the plaintiff acquired under a contract with the state. Such suit, whether brought to recover money or property in the hands of such defendants, unlawfully taken by them in behalf of the state, or for compensation in damages, or, in a proper case where the remedy at law is inadequate, for an injunction to prevent such wrong and injury, or for a mandamus, in a like case, to enforce upon the defendant the performance of a plain, legal duty, purely ministerial, is not, within the meaning of the eleventh amendment, an action against the state. Osborn v. Bank, 9 Wheat. 738; Davis v. Gray, 16 Wall. 203; Tomlinson v. Branch, 15 Wall. 460; Litchfield v. Webster Co., 101 U. S. 773; Allen v. Railroad Co., 114 U. S. 311, 5 Sup. Ct. 925, 962; Board v. McComb, 92 U. S. 531; Poindexter v. Greenhow, 114 U. S. 270, 5 Sup. Ct. 903, 962."

Complainant insists that his case is included in the reasoning of the court in the cases last cited, and also that he is entitled to present his bill to this court, relative to matters therein set forth, because of the provisions of the constitution of the United States, and particularly the fourteenth and fifteenth amendments thereof. To the consideration of this point, and of the constitutionality of the registration laws of the state of South Carolina, I now come.

Complainant insists that the registration laws of South Carolina are in contravention of the provisions of the constitution of that state, and that they also violate the constitution of the United States, thereby so affecting his rights as a citizen of the same as to entitle him to be heard in this court on the complaint he now presents. The constitution of South Carolina contains the following provisions:

Article 1, § 31: "All elections shall be free and open and every inhabitant of this commonwealth possessing the qualifications provided for in this constitution shall have equal right to elect officers and be elected to fill public offices."

Article 8, § 2: "Every male citizen of the United States of the age of 21 years and upwards, not laboring under the disabilities named in this constitution, without distinction of race, color or former condition, who shall be a resident of this state at the time of the adoption of this constitution, or who shall hereafter reside in this state one year, and in the county in which he offers to vote sixty days next preceding any election, shall be entitled to vote for all officers that are now or hereafter may be, elected by the people, and upon all questions submitted to the electors at any elections; provided, that no person shall be allowed to vote or hold office who is now, or hereafter may be, disqualified therefor by the constitution of the United States, until such disqualifications shall be removed by the congress of the United States; provided, further, that no person while kept in any alms house or asylum, or of unsound mind, or confined in any public prison, shall be allowed to vote or hold public office."

Article 8, § 3: "It shall be the duty of the general assembly to provide from time to time for the registration of all electors."

Article 8, § 7: "Every person entitled to vote at any election shall be eligible to any office which now is, or hereafter shall be, elective by the people in the county where he shall have resided sixty days previous to such election, except as otherwise provided in this constitution or the constitution and laws of the United States."

Article 8, § 8: "The general assembly shall never pass any law that will deprive any of the citizens of this state of the right of suffrage, except for treason, murder, robbery or dueling, whereof the persons shall have been duly tried and convicted."

Section 2, art. 1, of the constitution of the United States is as follows:

"The house of representatives shall be composed of members chosen every second year by the people of the several states, and the electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state legislature."

Section 1, art. 14, Amend., is in these words:

"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

Article 15 of the amendments to the constitution reads:

"Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of race, color, or previous condition of servitude.

"Sec. 2. The congress shall have power to enforce this article by appropriate legislation."

The congress has given to the circuit courts of the United States jurisdiction of all suits to enforce the right of citizens of the United States to vote in the several states. We now find that a citizen of South Carolina is a citizen of the United States residing in that state. The rights, privileges, and immunities belonging to him as a free citizen are his as a citizen of the United States, and do not depend upon his citizenship of that state. The plaintiff, Mills, a citizen of African descent, is a citizen of the United States and of the state of South Carolina. By the fourteenth amendment he has been made a citizen of the United States, and by the fifteenth amendment he is a voter in the state in which he resides. Previous to the adoption of these amendments, the race to which he belongs had no rights that the white men of this country were bound to respect, and it was not possible for any one belonging to it to be a citizen of the United States. In the Slaughterhouse Cases, 16 Wall. 68, the supreme court of the United States, referring to the time immediately preceding and following the adoption of these amendments, said:

"The institution of African slavery, as it existed in about half the states of the Union, and the contests pervading the public mind for many years between those who desired its curtailment and ultimate extinction and those who desired additional safeguards for its security and perpetuation, culminated in the effort, on the part of most of the states in which slavery existed, to separate from the federal government, and to resist its authority. This constituted the war of the Rebellion; and, whatever auxiliary causes may have contributed to bring about this war, undoubtedly the overshadowing and efficient cause was African slavery. In that struggle, slavery, as a legalized social relation, perished. It perished as a necessity of the bitterness and force of the conflict. When the armies of freedom found themselves upon the soil of slavery, they could do nothing less than free the poor victims whose enforced servitude was the foundation of the quarrel; and when hard pressed in the contest, these men (for they proved themselves men in that terrible crisis) offered their services, and were accepted by thousands to aid in suppressing the unlawful rebellion. Slavery was at an end wherever the federal government succeeded in that purpose. The proclamation of President Lincoln expressed an accomplished fact as to a large portion of the insurrectionary districts when he declared slavery abolished in them all. But, the war being over, those who had succeeded in re-establishing the authority of the federal government were not content to permit this great act of emancipation to rest on the actual results of the contest or the proclamation of the executive, both of which might have been questioned in after-times, and they determined to place this main and most valuable result in the constitution of the restored Union as one of its fundamental articles. Hence the thirteenth article of amendment of that instrument. Its two short sections seem hardly to admit of construction, so vigorous is their expression and so appropriate to the purpose we have indicated. '(1) Neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States or any place subject to their jurisdiction. (2) Congress shall have the power to enforce this article by appropriate legislation.' The process of restoring to their proper relation with the federal government and with the other states those which had sided with the Rebellion, undertaken under the proclamation of President Johnson in 1865, and before the assembling of congress, developed the fact that, notwithstanding the formal recognition by those states of the abolition of slavery, the condition of the slave race would, without further protection of the federal government, be almost as bad as it was before. Among the first acts of legislation adopted by several of the states in the legislative bodies which claimed to be in their normal relations with the federal government were laws which imposed upon the colored race onerous disabilities and burdens, and curtailed their rights in the pursuit of life, liberty,

and property to such an extent that their freedom was of little value, while they had lost the protection which they had received from their former owners from motives both of interest and humanity. They were, in some states, forbidden to appear in the towns in any other character than menial servants. They were required to reside on and cultivate the soil without the right to purchase or own it. They were excluded from many occupations of gain, and were not permitted to give testimony in the courts in any case where a white man was a party. It was said that their lives were at the mercy of bad men, either because the laws for their protection were insufficient or were not enforced. These circumstances, whatever of falsehood or misconception may have been mingled with their presentation, forced upon the statesmen who had conducted the federal government in safety through the crisis of the Rebellion, and who supposed that by the thirteenth article of amendment they had secured the result of their labors, the conviction that something more was necessary in the way of constitutional protection to the unfortunate race who had suffered so much. They accordingly passed through congress the proposition for the fourteenth amendment, and they declined to treat as restored to their full participation in the government of the Union the states which had been in insurrection, until they ratified that article by a formal vote of their legislative bodies.

"Before we proceed to examine more critically the provisions of this amendment, on which the plaintiffs in error rely, let us complete and dismiss the history of the recent amendments, as that history relates to the general purpose which pervades them all. A few years' experience satisfied the thoughtful men who had been the authors of the other two amendments that, notwithstanding the restraints of those articles on the states, and the laws passed under the additional powers granted to congress, these were inadequate for the protection of life, liberty, and property, without which freedom to the slave was no boon. They were in all those states denied the right of suffrage. The laws were administered by the white man alone. It was urged that a race of men distinctively marked as was the negro, living in the midst of another and dominant race, could never be fully secured in their person and their property without the right of suffrage. Hence the fifteenth amendment, which declares that the right of a citizen of the United States to vote shall not be denied or abridged by any state on account of race, color, or previous condition of servitude. The negro having, by the fourteenth amendment, been declared to be a citizen of the United States, is thus made a voter in every state of the Union. We repeat, then, in the light of this recapitulation of events, almost too recent to be called history, but which are familiar to us all, and on the most casual examination of the language of these amendments, no one can fail to be impressed with the one pervading purpose found in them all, lying at the foundation of each, and without which none of them would have been even suggested. We mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over them. It is true that only the fifteenth amendment, in terms, mentions the negro by speaking of his color and his slavery. But it is just as true that each of the other articles was addressed to the grievances of that race, and designed to remedy them, as the fifteenth. We do not say that no one else but the negro can share in this protection. Both the language and spirit of these articles are to have their fair and just weight in any question of construction. Undoubtedly, while negro slavery alone was in the mind of the congress which proposed the thirteenth article, it forbids any other kind of slavery, now or hereafter. If Mexican peonage or the Chinese coolie labor system shall develop slavery of the Mexican or Chinese race within our territory, this amendment may safely be trusted to make it void. And so, if other rights are assailed by the states, which properly and necessarily fall within the protection of these articles, that protection will apply, though the party interested may not be of African descent. But what we do say, and what we wish to be understood, is that, in any fair and just construction of any section or phrase of these amendments, it is necessary to look to the purpose which we have said was the pervading spirit of them all, the evil which they

were designed to remedy, and the process of continued addition to the constitution, until that purpose was supposed to be accomplished, as far as constitutional law can accomplish it. The first section of the fourteenth article, to which our attention is more especially invited, opens with a definition of citizenship; not only citizenship of the United States, but citizenship of the states. No such definition was previously found in the constitution, nor had any attempt been made to define it by act of congress. It had been the occasion of much discussion in the courts, by the executive departments, and in the public journals. It had been said by eminent judges that no man was a citizen of the United States, except as he was a citizen of one of the states composing the Union. Those, therefore, who had been born and resided always in the District of Columbia or in the territories, though within the United States, were not citizens. Whether this proposition was sound or not had never been judicially decided. But it had been held by this court, in the celebrated Drad Scott Case [19 How. 393], only a few years before the outbreak of the Civil War, that a man of African descent, whether a slave or not, was not, and could not be, a citizen of a state or of the United States. This decision, while it met the condemnation of some of the ablest statesmen and constitutional lawyers of the country, had never been overruled; and if it was to be accepted as a constitutional limitation of the right of citizenship, then all the negro race who had recently been made freemen were still not only not citizens, but were incapable of becoming so by anything short of an amendment to the constitution. To remove this difficulty primarily, and to establish a clear and comprehensive definition of citizenship, which should declare what should constitute citizenship of the United States and also citizenship of a state, the first clause of the first section was framed. 'All persons born or naturalized, in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside.' The first observation we have to make on this clause is that it puts at rest both the questions which we stated to have been the subject of differences of opinion. It declares that persons may be citizens of the United States without regard to their citizenship of a particular state, and it overturns the Dred Scott decision by making all persons born within the United States, and subject to its jurisdiction, citizens of the United States. That its main purpose was to establish the citizenship of the negro can admit of no doubt. The phrase, 'subject to its jurisdiction,' was intended to exclude from its operation children of ministers, consuls, and citizens or subjects of foreign states born within the United States."

While it is true that the supreme court has held that the fourteenth amendment did not add to the privileges and immunities of a citizen, and that no new voters were necessarily made by it, it is equally true that it, in effect, held that it increased the number of citizens entitled to suffrage under the constitution and laws of the states. It also held that in the light of the history of the late amendments there was no difficulty in giving a proper meaning to their provisions, and that the existence of laws in those states where the emancipated negroes resided which grossly discriminated against them as a class was the end to be remedied by them, and that by them such laws are forbidden. It also fully determined that a citizen of a state is now simply a citizen of the United States residing in that state; that his rights as such are those that belong to him as a citizen of the United States; and that they are not dependent upon his citizenship of the state, do not rest upon its legislation, and cannot be destroyed by its power. As I understand the decisions of the supreme court, they sustain the claim of this plaintiff that the courts of the United States are open for the relief of citizens of the United States whose privileges have been abridged by the state in which they reside. Certainly they should be, and I will surely so hold until

advised by that court that I am in error. From those same decisions I find that, while the right of suffrage is not a necessary attribute of federal citizenship, it surely is such an attribute as is exempt from discrimination in the exercise of that right on account of race and previous condition; and that, while the right to vote in the states comes from the states, the right of exemption from the prohibited discrimination comes from the United States. While, as a rule, the rights of a citizen of a state are such as all citizens of the United States enjoy, yet this plaintiff has also certain rights under the constitution of South Carolina by virtue of the act of congress of June 25, 1868, which was accepted and acted upon by that state; in which it is provided that the constitution of said state shall never be so changed as to deprive any citizen or class of citizens of the United States of the right to vote in said state who are entitled to vote by the constitution of the same, recognized in said act, except as a punishment for crime. The constitution there referred to is the one from which I have before quoted, the present organic law of that state.

Are the registration laws of South Carolina constitutional? Do they prevent the plaintiff and those situated like him from exercising the rights conferred upon and guaranteed to him and them? A registration law is not per se unconstitutional, but is the one referred to in the bill such as should be upheld by the courts? Does the state of South Carolina, by this legislation, deprive the plaintiff of any of the privileges to which he is entitled by the constitution of the United States and of that state? Does it deprive him of his liberty by taking from him a right by which he can preserve that liberty? Does it deny him the equal protection of her laws by enacting a system of registration which does not protect, but destroys his rights? If it does disfranchise him, are not his liberty and his property taken from him? If it does prevent him from voting (it is shown that he is duly qualified) for delegates to the constitutional convention mentioned in the bill, which may so change the organic law of the state as to affect his life, his property, his liberty, his franchise; if it denies to him the right to vote for a member of congress, and for electors for president and vice president of the United States, when they are chosen,—does it not do him and the country a grievous wrong; and by what authority? As pertinent to this, I quote the words of Mr. Justice Swayne, in the Slaughterhouse Cases:

"Life, liberty, and property are forbidden to be taken without due process of law, and equal protection of the laws is guaranteed to all. Life is the gift of God, and the right to preserve it is the most sacred of the rights of man. Liberty is freedom from all restraints but such as are justly imposed by law. Beyond that line lies the domain of usurpation and tyranny. Property is everything which has an exchangeable value, and the right of property includes the power to dispose of it according to the will of the owner. Labor is property, and as such merits protection. The right to make it available is next in importance to the rights of life and liberty. It lies to a large extent at the foundation of most other forms of property, and of all solid individual and national prosperity. 'Due process of law' is the application of the law as it exists in the fair and regular course of administrative procedure. 'The equal protection of

the laws' places all upon a footing of legal equality, and gives the same protection to all for the preservation of life, liberty, and property, and the pursuit of happiness." 16 Wall. 127.

It is not my intention at this time to state in detail the requirements and effect of each section of said registration law, but simply the result that I reach after a careful scrutiny of them all, aided as I have been by the exhaustive analysis of the same made by counsel. I find no warrant in the constitution for the certificate required by the registration law to be issued to the voter, the production of which is required at the polls or his vote is to be rejected. This is not registration, which is simply the entering on the books or lists of voters of the names of those qualified under the constitution to vote, but it is an additional requirement to those mentioned in the organic law; not intended, I am constrained to believe, to facilitate the full, free, and legal expression of those entitled to exercise the right of suffrage. Such requirement is unreasonable, burdensome, and harassing, and clearly it impedes and abridges the right of the constitutional voters of the state to cast their ballots. The additional requirement that the voter moving from one place to another in the same precinct must surrender his old and secure a new certificate, is without reason, and vexatious. While the mode prescribed for securing a renewal thereof in case of loss is so cumbersome, and peculiarly stringent, that it likely fulfills its object in deterring the ordinary voter from making the effort. The registration of voters closes on the 1st day of July preceding a general election, which is held in November following. What possible reason is there for this unreasonable course? During the four months preceding an election—the period voters generally devote to the examination of questions then to be determined and to the placing of their names on the voting lists, when such lists are required—it is utterly impossible for any duly-qualified voter to have his name registered, and necessarily results in depriving many of them of the right of suffrage. The only parties permitted to register during the four months preceding the election are those becoming of age during the period, provided they furnish satisfactory proof. The constitution says that the citizen who shall have been a resident of the state for one year and of the county in which he offers to vote for sixty days next preceding any election shall be entitled to vote at such election, and yet he is prohibited by this requirement from so doing. He has completed his one year's residence after the 1st day of July, but he cannot register, because the books are closed, and he cannot vote, because his name is not upon the books; and there is no provision by which he can prove to the election officers at the polls that he is a qualified and legal voter. This entire provision is most peculiar, without a precedent, and without defense, even from the advocates of the law. Why the books should be closed for months before the election, and kept open for months after it is over, to the uninformed would be passing strange; and yet in the light of the recent history of this state, and the discussion of this cause, is easily understood. That such requirements are not only unreasonable, but unconstitutional, is shown by the following cases: Morris v. Powell,

(Ind. Sup.) 25 N. E. 221; White v. Commissioners, 13 Or. 317, 10 Pac. 484; Kinneen v. Wells, 144 Mass. 497, 11 N. E. 916; State v. Williams, 5 Wis. 308; Quinn v. State, 35 Ind. 485; McCafferty v. Guyer, 59 Pa. St. 109; Green v. Shumway, 39 N. Y. 418; Monroe v. Collins, 17 Ohio St. 686; People v. Canaday, 73 N. C. 198; Cooley, Const. Lim. 753; Attorney General v. City of Detroit (Mich.) 44 N. W. 388.

A careful examination of the registration enactment of the state of South Carolina—excluding the act of 1894—brings me to the conclusion that if a voter who was duly qualified and entitled to register in May and June, 1882, did not, on account of absence, sickness, inadvertence, or other cause, register when the books were open in that year, he was not only prevented from voting at the general election in November, 1882, but was and has been prevented—under the law—from voting at all elections held in the state subsequent to said election in 1882. This seems almost incredible, yet I think it is correct. The statement is appalling, the outrage stupendous, the result close to the border land that divides outrage from crime. It is not necessary to discuss it further; likely the least said about it the better.

Does the act of 1894,—the convention act,—with its four sections relating to registration, cure the defects I have alluded to, and render valid the former unconstitutional laws I have mentioned? In my opinion, it does not. These sections refer to the old law, in fact are to be considered as part of it,—as amendments thereto; and they contain all the bad features thereof, including the certificates to be produced at the polls, and the closing of the books many days before the election. They also add to the qualifications contained in the constitution relative to the residence of the voter in the state and county. And they make no provision for the registering of voters between the closing of the books and the election, when their names have been omitted on account of absence, or other usually sufficient reason. Again, the applicant for registration must make affidavit setting forth his full name, age, occupation, and residence at the time of the general registration in 1882, or at the time thereafter when he became entitled to register, and also give the place or places of his residence since the time when he became entitled to register. This affidavit must be supported by the affidavit of two respectable citizens who were each of the age of 21 years on the 30th day of June, 1882, or at the time the applicant became entitled to register. Our most intelligent voters would dread this ordeal, this history of their movements for years, this statement of the different places where they have lived, this securing of two reputable affiants who must have been 21 years of age in 1882, or at the time the applicant arrived at voting age. With what crushing force, then, must it strike the weaker race, which is thus made to suffer by the stronger. How difficult for them to thus write out the books of their lives, and have all the pages thereof attested by two witnesses, reputable in the estimation of the registrar who alone is to judge them. In my opinion, the fact that there still remain several days—prior to the election—during which the plaintiff may apply for registration

does not, in the light of the allegations of the bill, the proofs tendered, and admissions made, prevent him from asking, nor the court from granting, the relief prayed for.

I was asked, in case any portion of the said registration laws should be found invalid, to eliminate the part so found, and decree that the remaining sections should stand. I have not been able to make the separation, for I find it all so interwoven as to render it impracticable, so far as results are concerned; and I cannot winnow where there is no grain. In behalf of those so treated, all interested in the welfare of their country, and desirous of seeing its laws enforced, should protest, in order that public sentiment should no longer be dormant, but may, by its activity, rouse the community that has suffered by such outrages to a realization of their cause, and to an appreciation of the beneficial results to be secured by the abolishment of the system that has caused them.

If we may judge of what the intention of the legislature was by the inevitable result of its enactment,—as we are assured we can (Soon Hing v. Crowley, 113 U. S. 703, 5 Sup. Ct. 730; Minnesota v. Barber, 136 U. S. 313, 10 Sup. Ct. 862),—then the one object that controlled the minds of those who formulated the enactment I have been considering was how to successfully destroy the greatest number of the ballots of the citizens of African descent, while at the same time to interfere with as few as possible of those of the white race. The fact is that, with a candor that was as frank as it was amazing, this was virtually admitted during the argument of this case. It is evident that the effect of this registration system is to fearfully impede the exercise of the right of suffrage by the colored voters of the state of South Carolina. It to a great extent defeats their constitutional right to vote, and it seems to be its leading —I must be permitted to say, its only—object, the effect being to so legislate as to apparently respect constitutional requirements, but at the same time to stab to the death the rights and immunities guaranteed by them. Finding, as I do, that the registration laws of South Carolina are unconstitutional, and that their enforcement will deprive the plaintiff, a citizen of the United States, of the rights of a citizen of the same, I conclude that this court has jurisdiction of this case, and that the same is not a proceeding against the state of South Carolina, prohibited by the eleventh amendment to the constitution of the United States. I find that the bill does present a question arising under the constitution and laws of the United States, and that the plaintiff has not a plain and adequate remedy at law; that the bill is sufficiently verified, and not multifarious. Under these circumstances it is the duty of the circuit court of the United States for the district of South Carolina to entertain this complaint, and grant the relief asked for.

I have noticed during the progress of this case a disposition to regard this court as a foreign jurisdiction, much to my surprise and my regret. This is as much a court of the state of South Carolina as is the circuit or supreme court of that state. The state of South Carolina assisted in forming the constitution and making the laws by virtue of which this court was organized and now convenes. This

court is and will be as careful and as jealous of the honor and the interests of that state as any of her citizens can be, and it hopes to merit their esteem by being worthy of it. A distinguished jurist of that state is my associate on the circuit, and the chief justice of the United States is its presiding justice. Why such a court of the United States, convening in South Carolina, administering the laws of the nation and of this state, should be regarded as a foreign court, is wonderful in the extreme, and as strange as is the story relative to which it is about to enter its decree.

I will pass an order as prayed for by complainant, restraining and enjoining the defendant individually and as supervisor of registration from the performance of any of the acts mentioned and complained of in the bill.