# UNITED STATES *v.* MIDWEST OIL COMPANY.

## APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 278. Argued January 9, 12, 1914; restored to docket April 20, 1914; reargued May 7, 1914.—Decided February 23, 1915.

Prior to initiation of some right given by law, the citizen has no enforceable interest in the public statutes and no private right in land which is the property of the people.

The practice of the withdrawal of public lands, both mineral and nonmineral, from private acquisition by the President without special authorization from Congress, after Congress has opened them to occupation, dates from an early period in the history of the Government, and the power so exercised has never been repudiated by Congress although it has always been subject to disaffirmance thereby.

The Land Department charged with the administration of the public domain has constantly asserted the power of the Executive to withdraw lands opened for occupation so long as they remain unappropriated.

Government is a practical affair intended for practical men, and the rule that long acquiescence in a governmental practice raises a presumption of authority applies to the practice of executive withdrawals by the Executive of lands opened by Congress for occupation.

While the Executive cannot by his course of action create a power, a long continued practice to withdraw lands from occupation after they have been opened by Congress, known to and acquiesced in by Congress, does raise a presumption that such power is exercised in pursuance of the consent of Congress or of a recognized administrative power of the Executive in the management of the public lands.

Laws and rules for the disposal of public lands are necessarily general in their nature, and Congress may by implication grant a power to the Executive to administer the public domain.

The power of Congress over the public domain is not only that of a legislative domain but also that of a proprietor, and it may deal with it as an individual owner may deal with his property and may grant powers to the Executive as an owner might grant powers to an agent, either expressly or by implication.

There is no distinction in principle between the power of the Executive

to make reservation of portions of the public domain and the power to withdraw them from occupation.

The validity of withdrawal orders made by the President in aid of future legislation has heretofore been expressly recognized by this court. *Bullard* v. *Des Moines R. R.*, 122 U. S. 170.

No action which Congress may have taken in any particular case can be construed as a denial of powers of the Executive to make temporary withdrawals of public land in the public interest, and the orders made and remaining in force are proof of congressional recognition of that power.

Silence of Congress after consideration of a practice by the Executive may be equivalent to acquiescence and consent that the practice be continued until the power exercised be revoked.

Nothing in the act of June 25, 1910, 36 Stat. 847, authorizing the President to withdraw lands and requiring lists of the same to be filed with Congress, can be construed as repudiating withdrawals already made.

Congress did not, by the act of June 25, 1910, take any rights from locators who had initiated rights prior to the withdrawal order of September 27, 1909, nor did it validate any location made after that date.

*Quære* whether, as an original question raised before any practice had been established, the President can withdraw from private acquisition land which Congress had made free and open to occupation and purchase. This case has been determined on other grounds and in the light of long continued practice.

THE facts, which involve the power of the President of the United States to withdraw public lands from entry under Rev. Stat., §§ 2319, 2329, and the act of February 11, 1897, and the effect of the withdrawal order No. 5 contained in the Proclamation of President Taft of September 27, 1909, are stated in the opinion.

*Mr. Assistant Attorney General Knaebel* and *The Solicitor General* for the United States.

*Mr. Joel F. Vaile,* with whom *Mr. Henry McAllister, Jr., Mr. William N. Vaile, Mr. Karl C. Schuyler, Mr. Walter F. Schuyler, Mr. A. M. Stevenson* and *Mr. Lee Champion* were on the brief, for the Midwest Oil Company *et al.:*

The withdrawal order of September 27, 1909, was not an appropriation of specific lands for naval, or other public use, but was avowedly for the purpose of preventing acquisition of public oil lands by qualified citizens under existing statutes, pending efforts to obtain a change of law. This was beyond the power of the President. *Kendall* v. *United States*, 12 Pet. 524, 612; *Marbury* v. *Madison*, 1 Cr. 137, 166; *United States* v. *Nicoll*, 1 Paine, 464; *Ex parte Merryman*, 17 Fed. Cas. No. 9487; *Deffeback* v. *Hawke*, 115 U. S. 392, 406; *Shaw* v. *Kellogg*, 170 U. S. 312.

The Executive cannot limit the rights given to the public lands by Congress. *United States* v. *United Verde Copper Co.*, 196 U. S. 207; *Morrill* v. *Jones*, 106 U. S. 466; *United States* v. *Eaton*, 144 U. S. 677; *Williamson* v. *United States*, 207 U. S. 425, 462; *United States* v. *George*, 228 U. S. 14.

The executive power is dependent on congressional authority. *United States* v. *Gratiot*, 14 Pet. 526, 536, 537; *United States* v. *Fitzgerald*, 15 Pet. 407, 421; *Van Brocklin* v. *Tennessee*, 117 U. S. 151, 168; *Wisconsin R. R.* v. *Price County*, 133 U. S. 496, 504; *Gibson* v. *Chouteau*, 13 Wall. 92, 99.

Except for certain doctrines first announced during the administration of President Roosevelt, the view of executive officers has been that the power to withdraw public lands from the operation of existing laws depended upon some authority of Congress. *Nor. Pac. R. R.* v. *Davis*, 19 L. D. 87, 88; *Atlantic & Pacific R. R.*, 6 L. D. 84, 87, 88.

President Taft himself doubted his authority when he said in his special message of January 14, 1910, that the power to withdraw from the operation of existing statutes, lands the disposition of which would be detrimental to the public interests was not clear and satisfactory; that unfortunately Congress had not fully acted on the recommendations of the executive; that the question as to what the executive should do was full of dif-

ficulty; and that he thought it the duty of Congress by statute to validate withdrawals made by the Secretary of Interior and the President, and to authorize the Secretary temporarily to withdraw lands pending submission to Congress of recommendations as to legislation to meet conditions of emergencies as they arise.

The Executive does not possess the power to withdraw public lands from the operative effect of existing laws, without the authority of some law of Congress which, by direct expression or by necessary implication, shall give such power of withdrawal. *Hewitt* v. *Schultz*, 180 U. S. 139; *Southern Pacific R. R.* v. *Bell*, 183 U. S. 675, 685, 686; *Brandon* v. *Ard*, 211 U. S. 11, 21; *Wolsey* v. *Chapman*, 101 U. S. 755, 769; *Lockhart* v. *Johnson*, 181 U. S. 516, 520; *Leecy* v. *United States*, 190 Fed. Rep. 289; *Nelson* v. *Nor. Pac. R. R.*, 188 U. S. 108, 133; *Sjoli* v. *Dreschel*, 199 U. S. 564, 566; *Osborn* v. *Froyseth*, 216 U. S. 571, 574; *Hoyt* v. *Weyerhaeuser*, 161 Fed. Rep. 324; *Weyerhaeuser* v. *Hoyt*, 219 U. S. 380.

Although especially urged by the Government the Des Moines river cases do not militate against the contention of appellees. *Bullard* v. *Des Moines R. R.*, 122 U. S. 167; *Dubuque & Pacific Ry.* v. *Litchfield*, 23 How. 66; *Wolcott* v. *Des Moines Co.*, 5 Wall. 681, 688, 689; *Williams* v. *Baker*, 17 Wall. 144, 147; *Wolsey* v. *Chapman*, 101 U. S. 755, 769; 5 Stat. 456; 9 Stat. 77; 11 Stat. 10.

The authority of the President to make the withdrawal of lands now under consideration is not sustained by the fact that he has the power to make reservations for military purposes and for Indian reservations. *Wilcox* v. *Jackson*, 13 Pet. 496; *McConnell* v. *Wilcox*, 1 Scam. 344; *Grisar* v. *McDowell*, 6 Wall. 363; *United States* v. *Tichenor*, 12 Fed. Rep. 415, 423; *Florida Imp. Co.* v. *Bigalsky*, 44 Florida, 771; 17 Ops. Atty. Genl. 160, 163; 17 Ops. Atty. Genl. 258, 260; *United States* v. *Payne*, 8 Fed. Rep. 883,

888; *Gibson* v. *Anderson*, 131 Fed. Rep. 39, 41, can all be distinguished.

The expression "public uses" involved in those cases, refers to governmental uses rendered necessary for the proper discharge of the functions committed to the executive branch of the Government in its various departments. It does not apply to any broad exercise of power, independent of an immediately intended governmental use. *Covington* v. *Kentucky*, 173 U. S. 231, 242; *Williams* v. *Lash*, 8 Gilfillan (Minn.), 496; *Orr* v. *Quimby*, 54 N. H. 590; *United States* v. *Leathers*, 6 Sawyer, 17; *United States* v. *Martin*, 14 Fed. Rep. 817; *McFadden* v. *Mountain View M. & M. Co.*, 97 Fed. Rep. 670; *United States* v. *Grand Rapids and Ind. Ry.*, 154 Fed. Rep. 131; *In re Wilson*, 140 U. S. 575; *Spalding* v. *Chandler*, 160 U. S. 394.

The President's power to reserve public lands for public uses finds its sanction in acts of Congress. Even where no specific statute directly authorizes the executive act, it nevertheless derives its authority from an assumed grant by Congress, manifested by frequent enactments of statutes giving like authority in like cases. Its extent is limited to the setting apart of particular tracts of land for public uses, as the exigencies of the public service may require.

The words contained in certain acts providing for agricultural entries or making grants of land, which except therefrom lands reserved "by proclamation of the President," or "by order of the President," or "by competent authority," will not sustain an order which withdraws the public mineral domain from the operation of existing statutes. *Grisar* v. *McDowell*, 6 Wall. 381; Black on Interpretation of Laws, p. 191; *The Paulina's Cargo*, 7 Cranch, 52, 60; *Cantwell* v. *Owens*, 14 Maryland, 215, 226; *Rich* v. *Keyser*, 54 Pa. St. 86, 89; *Dickenson* v. *Fletcher*, L. R. 9 C. P. 1, 8; *Edrich's Case*, 5 Rep. 118, 77 English Rep. 238; *Moser* v. *Newman*, 6 Bingham, 556, 130 English Rep. 1395; *Johnson* v. *United States*, 225

U. S. 405, 415, 416; *United States* v. *Perry*, 50 Fed. Rep. 743, 748; 1 C. C. A. 648.

Prior to June 25, 1910, neither the President nor the Secretary of the Interior had any power to withdraw public mineral-oil lands from location or entry under the existing mining laws.

Prior to 1866 Congress itself had reserved all mineral lands from sale, and this congressional reservation left no opportunity during that period for and withdrawal of mineral lands by executive authority. *United States* v. *Gratiot*, 14 Pet. 526; *United States* v. *Gear*, 3 How. 120; *Deffeback* v. *Hawke*, 115 U. S. 392, 400; Barringer & Adams on the Law of Mines and Mining, page 194; Curtis H. Lindley on Mines, § 47, 2d ed.; *Newhall* v. *Sanger*, 92 U. S. 761, 763.

Since July, 1866, the mining laws have contained complete and exclusive provisions as to the control and disposition of public mineral lands.

The act of February 11, 1897, must, therefore, continue to be the law until repealed by some other act of Congress, or by the enactment of some other law which has the effect of repealing it. There has been no such repeal, and no repugnant law has been enacted. *United States* v. *Gear*, 3 How. 120, 131; *McConnell* v. *Wilcox, supra; Fort Boise Hay Reservation*, 6 L. D. 16, 18; *Kendall* v. *United States, supra; Cotting* v. *Kansas &c. Co.*, 183 U. S. 79, 84; *Marbury* v. *Madison*, 1 Cranch, 166; *The Floyd Acceptances*, 7 Wall. 666, 676, 677.

There has been no long-continued practice or customary usage to support the withdrawal of mineral lands from the operation of existing laws, although some appropriations of land for military reservations, or some setting apart of specific lands for occupancy by the Indians, may have contained mineral deposits. *Gibson* v. *Anderson*, 131 Fed. Rep. 39; *Behrends* v. *Goldsteen*, 1 Alaska, 518, 524.

There has, however, never been a practice and never

been a usage on the part of executive officers of withdrawing public mineral lands from location or entry under existing laws.

To withdraw large tracts of the public mineral domain from the operation of the acts of May 10, 1872, and of February 11, 1897, was to suspend the operation of those laws. To so suspend the operation of laws is legislation—not regulation.

The act of June 25, 1910, did not validate any previous withdrawal, it did not authorize the ratification or confirmation of any such previous withdrawal, and the withdrawal order of July 2, 1910, did not affect any rights previously acquired under existing mining laws.

This enactment speaks only *in futuro*. It is not in any respect retroactive. *Murray* v. *Gibson*, 15 How. 420, 423; *McEwen* v. *Lessee*, 24 How. 242, 244; *Harvey* v. *Tyler*, 2 Wall. 328, 347; *Sohn* v. *Waterson*, 17 Wall. 596, 599; *Twenty Per Cent Cases*, 20 Wall. 179, 187; *Chew Heong* v. *United States*, 112 U. S. 536, 559.

The attempted ratification of previous withdrawals contained in the order of July 2, 1910, is void.

Prior to the approval of the act of June 25, 1910, appellees' grantors had acquired vested rights in the property in controversy, and on June 25, 1910, these rights could not be affected even by act of Congress, much less by an executive order. *Belk* v. *Meagher*, 104 U. S. 279, 283; *Gwillim* v. *Donnellan*, 115 U. S. 45, 49; *Noyes* v. *Mantle*, 127 U. S. 348, 353; *Manuel* v. *Wulff*, 152 U. S. 505, 510, 511; 1 Lindley on Mines, §§ 169, 539; 1 Snyder on Mines, §§ 451, 466; 25 Land Decisions, 48, 51.

The decision and opinion of this court will determine for the future the proper constitutional exercise of governmental functions of greatest importance.

By leave of court, *Mr. Aldis B. Browne, Mr. Alexander Britton, Mr. Evans Browne, Mr. Francis W. Clements,*

*Mr. Frederic R. Kellogg, Mr. E. S. Pillsbury* and *Mr. Oscar Sutro* filed briefs as *amici curiæ.*

By leave of court, *Mr. Frank H. Short* filed a brief as *amicus curiæ.*

MR. JUSTICE LAMAR delivered the opinion of the court.

All public lands containing petroleum or other mineral oils and chiefly valuable therefor, have been declared by Congress to be "free and open to occupation, exploration and purchase by citizens of the United States . . . under regulations prescribed by law." Act of February 11, 1897, c. 216, 29 Stat. 526; R. S. 2319, 2329.

As these regulations permitted exploration and location without the payment of any sum, and as title could be obtained for a merely nominal amount, many persons availed themselves of the provisions of the statute. Large areas in California were explored; and petroleum having been found, locations were made, not only by the discoverer but by others on adjoining land. And, as the flow through the well on one lot might exhaust the oil under the adjacent land, the interest of each operator was to extract the oil as soon as possible so as to share what would otherwise be taken by the owners of nearby wells.

The result was that oil was so rapidly extracted that on September 17, 1909, the Director of the Geological Survey made a report to the Secretary of the Interior which, with enclosures, called attention to the fact that, while there was a limited supply of coal on the Pacific coast and the value of oil as a fuel had been fully demonstrated, yet at the rate at which oil lands in California were being patented by private parties it would "be impossible for the people of the United States to continue ownership of oil lands for more than a few months. After that the

Government will be obliged to repurchase the very oil that it has practically given away. . . ." "In view of the increasing use of fuel by the American Navy there would appear to be an immediate necessity for assuring the conservation of a proper supply of petroleum for the Government's own use . . ." and "pending the enactment of adequate legislation on this subject, the filing of claims to oil lands in the State of California should be suspended."

This recommendation was approved by the Secretary of the Interior. Shortly afterwards he brought the matter to the attention of the President who, on September 27, 1909, issued the following Proclamation:

"Temporary Petroleum Withdrawal No. 5."

"In aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain, all public lands in the accompanying lists are hereby temporarily withdrawn from all forms of location, settlement, selection, filing, entry, or disposal under the mineral or nonmineral public-land laws. All locations or claims existing and valid on this date may proceed to entry in the usual manner after field investigation and examination." The list attached described an area aggregating 3,041,000 acres in California and Wyoming—though, of course, the order only applied to the public lands therein, the acreage of which is not shown.

On March 27, 1910, six months after the publication of the Proclamation, William T. Henshaw and others entered upon a quarter section of this public land in Wyoming so withdrawn. They made explorations, bored a well, discovered oil and thereafter assigned their interest to the Appellees, who took possession and extracted large quantities of oil. On May 4, 1910, they filed a location certificate.

As the explorations by the original claimants, and the

subsequent operation of the well, were both long after the date of the President's Proclamation, the Government filed, in the District Court of the United States for the District of Wyoming, a Bill in Equity against the Midwest Oil Company and the other Appellees, seeking to recover the land and to obtain an accounting for 50,000 barrels of oil alleged to have been illegally extracted. The court sustained the defendant's demurrer and dismissed the bill. Thereupon the Government took the case to the Circuit Court of Appeals of the Eighth Circuit which rendered no decision but certified certain questions to this court, where an order was subsequently passed directing the entire record to be sent up for consideration.

The case has twice been fully argued. Both parties, as well as other persons interested in oil lands similarly affected, have submitted lengthy and elaborate briefs on the single and controlling question as to the validity of the Withdrawal Order. On the part of the Government it is urged that the President, as Commander-in-Chief of the Army and Navy, had power to make the order for the purpose of retaining and preserving a source of supply of fuel for the Navy, instead of allowing the oil land to be taken up for a nominal sum, the Government being then obliged to purchase at a great cost what it had previously owned. It is argued that the President, charged with the care of the public domain, could, by virtue of the executive power vested in him by the Constitution (Art. 2, § 1), and also in conformity with the tacit consent of Congress, withdraw, in the public interest, any public land from entry or location by private parties.

The Appellees, on the other hand, insist that there is no dispensing power in the Executive and that he could not suspend a statute or withdraw from entry or location any land which Congress had affirmatively declared should be free and open to acquisition by citizens of the United States. They further insist that the withdrawal

order is absolutely void since it appears on its face to be a mere attempt to suspend a statute—supposed to be unwise,—in order to allow Congress to pass another more in accordance with what the Executive thought to be in the public interest.

1. We need not consider whether, as an original question, the President could have withdrawn from private acquisition what Congress had made free and open to occupation and purchase. The case can be determined on other grounds and in the light of the legal consequences flowing from a long continued practice to make orders like the one here involved. For the President's proclamation of September 27, 1909, is by no means the first instance in which the Executive, by a special order, has withdrawn land which Congress, by general statute, had thrown open to acquisition by citizens. And while it is not known when the first of these orders was made, it is certain that "the practice dates from an early period in the history of the government." *Grisar* v. *McDowell*, 6 Wall. 381. Scores and hundreds of these orders have been made; and treating them as they must be (*Wolsey* v. *Chapman*, 101 U. S. 769), as the act of the President, an examination of official publications will show that (excluding those made by virtue of special congressional action, *Donnelly* v. *United States*, 228 U. S. 255) he has during the past 80 years, without express statutory authority—but under the claim of power so to do—made a multitude of Executive Orders which operated to withdraw public land that would otherwise have been open to private acquisition. They affected every kind of land—mineral and nonmineral. The size of the tracts varied from a few square rods to many square miles and the amount withdrawn has aggregated millions of acres. The number of such instances cannot, of course, be accurately given, but the extent of the practice can best be appreciated by a consideration of what is believed

to be a correct enumeration of such Executive Orders mentioned in public documents.[1]

They show that prior to the year 1910 there had been issued

 99  Executive Orders establishing or enlarging Indian Reservations;

109  Executive Orders establishing or enlarging Military Reservations and setting apart land for water, timber, fuel, hay, signal stations, target ranges and rights of way for use in connection with Military Reservations;

 44  Executive Orders establishing Bird Reserves.

In the sense that these lands may have been intended for public use, they were reserved for a public purpose. But they were not reserved in pursuance of law or by virtue of any general or special statutory authority. For, it is to be specially noted that there was no act of Congress providing for Bird Reserves or for these Indian Reservations. There was no law for the establishment of these

---

[1] Departmental Ruling as to the existence of the power.

    Report, Commissioner of the Land Office, February 28, 1902, p. 3.  17 Senate Doc. 57th Cong.

    Appendix to Call's "Military Reservations," 495.

    Decisions of Department of the Interior relating to Public Lands. 702, 31, 552; 13 *Id.* 426, 607, 628; 1 L. D. 553; 29 *Id.* 33; 31 *Id.* 195; 34 *Id.* 145; 6 *Id.* 317.

Indian Reservations:

    "Executive Orders relating to Indian Reservations" (1912).

    Public Domain, 243.

    Report of Commissioner of Indian Affairs, 70–87 (1913).

Military Reservations:

    Public Domain, 247.

    14 House Doc. 217 (1898–99).

    18 House Doc. 387 (1905-6).

    Call's "Military Reservations" (1910).

Bird Reservations:

    42 House Doc. 93 (1908).

    43 House Doc. 44 (1909).

Military Reservations or defining their size or location. There was no statute empowering the President to withdraw any of these lands from settlement or to reserve them for any of the purposes indicated.

But when it appeared that the public interest would be served by withdrawing or reserving parts of the public domain, nothing was more natural than to retain what the Government already owned. And in making such orders, which were thus useful to the public, no private interest was injured. For prior to the initiation of some right given by law the citizen had no enforceable interest in the public statute and no private right in land which was the property of the people. The President was in a position to know when the public interest required particular portions of the people's lands to be withdrawn from entry or location; his action inflicted no wrong upon any private citizen, and being subject to disaffirmance by Congress, could occasion no harm to the interest of the public at large. Congress did not repudiate the power claimed or the withdrawal orders made. On the contrary it uniformly and repeatedly acquiesced in the practice and, as shown by these records, there had been, prior to 1910, at least 252 Executive Orders making reservations for useful, though non-statutory purposes.

This right of the President to make reservations,—and thus withdraw land from private acquisition,—was expressly recognized in *Grisar* v. *McDowell*, 6 Wall. 364 (9), 381, where (1867) it was said that "from an early period in the history of the Government it has been the practice of the President to order, from time to time, as the exigencies of the public service required, parcels of land belonging to the United States to be reserved from sale and set apart for public uses."

But notwithstanding this decision and the continuity of this practice, the absence of express statutory authority was the occasion of doubt being expressed as to the power

of the President to make these orders. The matter was therefore several times referred to the law officers of the Government for an opinion on the subject. One of them stated (1889) (19 Op. 370) that the validity of such orders rested on "a long-established and long-recognized power in the President to withhold from sale or settlement, at discretion, portions of the public domain." Another reported that "the power of the President was recognized by Congress and that such recognition was equivalent to a grant" (17 Op. 163) (1881). Again, when the claim was made that the power to withdraw did not extend to mineral land, the Attorney General gave the opinion that the power "must be regarded as extending to any lands which belong to the public domain, and capable of being exercised with respect to such lands so long as they remain unappropriated." (17 Op. 232) (1881).

Similar views were expressed by officers in the Land Department. Indeed, one of the strongest assertions of the existence of the power is the frequently quoted statement of Secretary Teller made in 1881:

"That the power resides in the Executive from an early period in the history of the country to make reservations has never been denied either legislatively or judicially, but on the contrary has been recognized. It constitutes in fact a part of the Land Office law, exists *ex necessitati rei*, is indispensable to the public weal and in that light, by different laws enacted as herein indicated, has been referred to as an existing undisputed power too well settled ever to be disputed." 1 L. D., 338 (1881–3.)

2. It may be argued that while these facts and rulings prove a usage they do not establish its validity. But government is a practical affair intended for practical men. Both officers, law-makers and citizens naturally adjust themselves to any long-continued action of the Executive Department—on the presumption that unauthorized acts would not have been allowed to be so

often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle but the basis of a wise and quieting rule that in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself—even when the validity of the practice is the subject of investigation.

This principle, recognized in every jurisdiction, was first applied by this court in the often cited case of *Stuart* v. *Laird,* 1 Cranch, 299, 309. There, answering the objection that the act of 1789 was unconstitutional in so far as it gave Circuit powers to Judges of the Supreme Court, it was said (1803) that, "practice and acquiescence under it for a period of several years, commencing with the organization of the judicial system, affords an irresistible answer, and has indeed fixed the construction. It is a contemporary interpretation of the most forcible nature. This practical exposition is too strong and obstinate to be shaken or controlled."

Again, in *McPherson* v. *Blacker,* 146 U. S. 1 (4), where the question was as to the validity of a state law providing for the appointment of Presidential electors, it was held that, if the terms of the provision of the Constitution of the United States left the question of the power in doubt, the "contemporaneous and continuous subsequent practical construction would be treated as decisive" (36). *Fairbank* v. *United States,* 181 U. S. 307; *Cooley* v. *Board of Wardens,* 12 How. 315; *The Laura,* 114 U. S. 415. See also *Grisar* v. *McDowell,* 6 Wall. 364, 381, where, in 1867, the practice of the Executive Department was referred to as evidence of the validity of these orders making reservations of public land, even when the practice was by no means so general and extensive as it has since become.

3. These decisions do not, of course, mean that private rights could be created by an officer withdrawing for a Rail Road more than had been authorized by Congress in the land grant act. *Southern Pacific* v. *Bell,* 183 U. S.

685; *Brandon* v. *Ard*, 211 U. S. 21. Nor do these decisions mean that the Executive can by his course of action create a power. But they do clearly indicate that the long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the withdrawals had been made in pursuance of its consent or of a recognized administrative power of the Executive in the management of the public lands. This is particularly true in view of the fact that the land is property of the United States and that the land laws are not of a legislative character in the highest sense of the term (Art. 4, § 3) "but savor somewhat of mere rules prescribed by an owner of property for its disposal."' *Butte City Water Co.* v. *Baker*, 196 U. S. 126.

These rules or laws for the disposal of public land are necessarily general in their nature. Emergencies may occur, or conditions may so change as to require that the agent in charge should, in the public interest, withhold the land from sale; and while no such express authority has been granted, there is nothing in the nature of the power exercised which prevents Congress from granting it by implication just as could be done by any other owner of property under similar conditions. The power of the Executive, as agent in charge, to retain that property from sale need not necessarily be expressed in writing. *Lockhart* v. *Johnson*, 181 U. S. 520; *Bronson* v. *Chappell*, 12 Wall. 686; *Campbell* v. *City of Kenosha*, 5 Wall. 194 (2).

For it must be borne in mind that Congress not only has a legislative power over the public domain, but it also exercises the powers of the proprietor therein. Congress "may deal with such lands precisely as a private individual may deal with his farming property. It may sell or withhold them from sale." *Camfield* v. *United States*, 167 U. S. 524; *Light* v. *United States*, 220 U. S. 536. Like any other owner it may provide when, how and to whom its land can be sold. It can permit it to be withdrawn from sale. Like any other owner, it can waive its strict rights,

as it did when the valuable privilege of grazing cattle on this public land was held to be based upon an "implied license growing out of the custom of nearly a hundred years." *Buford* v. *Houtz,* 133 U. S. 326. So too, in the early days the "Government, by its silent acquiescence, assented to the general occupation of the public lands for mining." *Atchison* v. *Peterson,* 20 Wall. 512. If private persons could acquire a privilege in public land by virtue of an implied congressional consent, then for a much stronger reason, an implied grant of power to preserve the public interest would arise out of like congressional acquiescence.

The Executive, as agent, was in charge of the public domain; by a multitude of orders extending over a long period of time and affecting vast bodies of land, in many States and Territories, he withdrew large areas in the public interest. These orders were known to Congress, as principal, and in not a single instance was the act of the agent disapproved. Its acquiescence all the more readily operated as an implied grant of power in view of the fact that its exercise was not only useful to the public but did not interfere with any vested right of the citizen.

4. The appellees, however, argue that the practice thus approved, related to Reservations—to cases where the land had been reserved for military or other special public purposes—and they contend that even if the President could reserve land for a public purpose or for naval uses, it does not follow that he can withdraw land in aid of legislation.

When analyzed, this proposition, in effect, seeks to make a distinction between a Reservation and a Withdrawal— between a Reservation for a purpose, not provided for by existing legislation, and a Withdrawal made in aid of future legislation. It would mean that a Permanent Reservation for a purpose designated by the President, but not provided for by a statute, would be valid, while a merely Temporary Withdrawal to enable Congress to

legislate in the public interest would be invalid. It is only necessary to point out that, as the greater includes the less, the power to make permanent reservations includes power to make temporary withdrawals. For there is no distinction in principle between the two. The character of the power exerted is the same in both cases. In both, the order is made to serve the public interest and in both the effect on the intending settler or miner is the same.

But the question need not be left solely to inference, since the validity of withdrawal orders, in aid of legislation, has been expressly recognized in a series of cases involving a number of such orders, made between 1850 and 1862. *Dubuque & Pac. R. R.* v. *Litchfield*, 23 How. 66; *Wolcott* v. *Des Moines Co.*, 5 Wall. 681; *Wolsey* v. *Chapman*, 101 U. S. 755; *Litchfield* v. *Webster County*, 101 U. S. 773; *Bullard* v. *Des Moines &c. R. R.*, 122 U. S. 167.

It appears from these decisions, and others cited therein, that in 1846 Congress made to the Territory of Iowa, a grant of land on both sides of the Des Moines, for the purpose of improving the navigation from the mouth of the river to Raccoon Fork, 5 Wall. 681. There was from the outset a difference of opinion as to whether the grant extended throughout the entire course of the river or was limited to the land opposite that portion of the stream which was to be improved. In *Dubuque & Pac. R. R.* v. *Litchfield*, 23 How. 66, decided in 1861, it was held that the grant only included the land between the mouth of the river and Raccoon Fork. But for eleven years prior to that decision there had been various and conflicting rulings by the Land Department. It was first held that the grant included land *above* the Fork and certificates were issued to the Territory as the work progressed. That ruling was shortly followed by another that the grant extended only *up to* the Fork.

"On April 6, 1850, Secretary Ewing, while concurring with Attorney General Crittenden in his opinion that the

grant of 1846 did not extend above the Raccoon Fork, issued an order withholding all the land then in controversy from market until the close of the then session of Congress, which order has been continued ever since," (we italicize) "*in order to give the State the opportunity of petitioning for an extension of the grant by Congress.*" *Bullard* v. *Des Moines R. R.*, 122 U. S. 170.

The withdrawal was made in 1851. The hoped-for legislation was not passed until several years later. Between those dates various private citizens made settlements by which, under various statutes they initiated rights and acquired an interest in the land—if the withdrawal order was void. But by such settlements they obtained no rights if the withdrawal order was valid. A subsequent ratification could have related back to 1851, but if the withdrawal was originally void, the ratification of course, could not cut out intervening rights of settlers. *Cook* v. *Tullis*, 18 Wall. 338.

There was litigation between settlers claiming, as here, under existing land laws, and those whose title depended upon the original validity of the *withdrawals made in aid of legislation.* (*Riley* v. *Welles*, 154 U. S. 578; *Bullard* v. *Des Moines R. R.*, 122 U. S. 173; *Wolcott* v. *Des Moines*, 5 Wall. 681.) In those suits, the withdrawal orders were not treated as having derived their validity from the legislation subsequently passed in aid of Iowa and its assignees, but they were treated as having been effective from their dates, regardless of the fact that the land included therein had not originally been granted to Iowa. In one of them it was said that:

"*This Court has decided in a number of cases, in regard to these lands, that this withdrawal operated to exclude from sale, purchase, or preëmption all the lands in controversy. . . .*" *Bullard* v. *Des Moines R. R.*, 122 U. S. 170.

5. Beginning in 1850 with this order of Secretary

Ewing, in aid of legislation on behalf of Iowa, and its continuance even after this Court had decided that no land above the Fork passed to the Territory (23 How. 66), the practice of making withdrawals continued down to 1910. The reasons for making the withdrawal orders varied but the power exerted was the same and was supported by the same implied consent of Congress.

For, if any distinction can be drawn between the principle decided in the *Iowa* cases and this; or if the power involved in making a Reservation could differ from that exercised in making a Withdrawal—then the Executive practice and congressional acquiescence, which operated as a grant of an implied power to make Permanent Reservations, are also present to operate as a grant of an implied power to make Temporary Withdrawals. It may be well to refer to some of the public records showing the existence and extent of the practice.

Withdrawals in aid of legislation were made in particular cases (26 L. D. 347; 28 L. D. 361; 35 L. D. 11), and many others more general in their nature and much more extensive in their operation.

For example: The Land Department passed an order suspending the location and settlement of certain islands and all isolated tracts containing less than 40 acres "with a view to submitting to Congress" the question as to whether legislation on the subject was not needed. 34 L. D. 245.

Reports to the 56th and 57th Congresses (26 Sen. Doc. 87; 22 House Doc. 108, 445) contained a list of "Temporary Withdrawals" made to prevent the disposal of land pending the consideration of the question of the advisability of setting the same apart as forest reservations."

Phosphate land was "temporarily withdrawn, pending action by Congress." House Doc. 43, 10, 61st Cong., 2d Sess.

There were also temporary withdrawals of oil land from

agricultural entry, in aid of subsequent legislation. 26 Sen. Doc. 75; 43 House Doc. 8, 9, 10, 13 (61st Cong.).

In pursuance of a like practice and power, public land containing coal was withdrawn "pending the enactment of new legislation" 35 L. D. 395; 43 H. Doc. 8, 13. In the Message of the President to the 2d session of the 59th Congress attention was called to the withdrawal of coal lands in aid of legislation. There was no repudiation of the order or of the practice either at that session or at any succeeding session of Congress. It was claimed in the argument that the act of 1908 (35 Stat. 424) was the legislation contemplated by the Executive when coal lands were temporarily withdrawn by the order of 1906; and reference has already been made to the act of 1861 concerning the Iowa lands withdrawn in 1849. There were other instances in which there was congressional action at a more or less remote period after the order of temporary withdrawal. The land for the Wind Cave Park was withdrawn in 1900 and the Park was established in 1903 (32 Stat. 765); Bird Reserves were established in 1903 and, in 1906 (34 Stat. 536), an act was passed making it an offense to interfere with birds on Reserves established by law, proclamation or *Executive Order.* See also 35 L. D. 11; 34 Stat. 517. But in the majority of cases there was no subsequent legislation in reference to such lands, although the withdrawal orders prevented the acquisition of any private interest in such land until after the order was revoked.

Whether, in a particular case, Congress acted or not, nothing was done by it which could, in any way, be construed as a denial of the right of the Executive to make temporary withdrawals of public land in the public interest. Considering the size of the tracts affected and the length of time they remained in force, without objection, these orders by which *islands, isolated tracts, coal, phosphate and oil lands were withdrawn in aid of legislation,*

furnish, in and of themselves, ample proof of congressional recognition of the power to withdraw.

But that the existence of this power was recognized and its exercise by the Executive assented to by Congress, is emphasized by the fact that the above-mentioned withdrawals were issued after the Report which the Secretary of the Interior made in 1902, in response to a resolution of the Senate calling for information "as to what, if any, of the public lands have been withdrawn from disposition under the settlement or other laws by order of the Commissioner of the General Land Office and *what, if any, authority of law exists for such order of withdrawal.*"

The answer to this specific inquiry was returned March 3, 1902, (Senate Doc. 232, 57th Cong., 1st Sess., Vol. 17). On that date the Secretary transmitted to the Senate the elaborate and detailed report of the Commissioner of the Land Office, who in response to the inquiry as to the authority by which withdrawals had been made, answered that:

"the power of the Executive Department of the Government to make reservations of land for public use, and to temporarily withdraw lands from appropriation by individuals as exigencies might demand, to prevent fraud, to aid in proper administration and in aid of pending legislation is one that has been long recognized both in the acts of Congress and the decisions of the court; . . . that this power has been long exercised by the Commissioner of the General Land Office is shown by reference to the date of some of the withdrawals enumerated. . . . The attached list embraces only such lands as were withdrawn by this office, acting on its own motion, in cases where the emergencies appeared to demand such action in furtherance of public interest and does not include lands withdrawn under express statutes so directed."

The list, which is attached, refers to withdrawal orders about 100 in number, issued between 1870 and 1902.

Many of them were in aid of the administration of the land laws: to correct boundaries; to prevent fraud; to make a classification of the land, and like good—but non-statutory—reasons. Some were made to prevent settlements while the question was being considered as to whether the lands might not be included in a forest reservation to be thereafter established. One in 1889 (referred to also in 28 L. D. 358) was made in order to afford the State of Nebraska an opportunity to procure legislative relief, as in the *Iowa* cases above cited.

This report refers to *Withdrawals* and not to *Reservations.* It is most important in connection with the present inquiry as to whether Congress knew of the practice to make temporary withdrawals and knowingly assented thereto. It will be noted that the Resolution called on the Department to state the extent of such withdrawals and the authority by which they were made. The officer of the Land Department in his answer shows that there have been a large number of withdrawals made for good but for non-statutory reasons. He shows that these 92 orders had been made by virtue of a long-continued practice and under claim of a right to take such action in the public interest "as exigencies might demand. . . ." Congress with notice of this practice and of this claim of authority, received the Report. Neither at that session nor afterwards did it ever repudiate the action taken or the power claimed. Its silence was acquiescence. Its acquiescence was equivalent to consent to continue the practice until the power was revoked by some subsequent action by Congress.

6. Nor is the position of the appellees strengthened by the act of June 25, 1910 (36 Stat. 847), to authorize the President to make withdrawals of public lands and requiring a list of the same to be filed with Congress.

It was passed after the President's Proclamation of September 27, 1909, and months after the occupation

and attempted location by virtue of which the Appellees claim to have acquired a right to the land. This statute expressly provided that it should not "be construed as a recognition, abridgment or enlargement of any asserted rights or claims initiated upon any oil or gas-bearing lands after any withdrawal of such lands made prior to the passage of this act."

True, as argued, the act provides that it shall not be construed as an "*abridgment* of asserted rights initiated in oil lands after they had been withdrawn." But it likewise provides that it shall not be considered as a "recognition of such rights." There is however nothing said indicating the slightest intent to repudiate the withdrawals already made.

The legislative history of the statute shows that there was no such intent and no purpose to make the Act retroactive or to disaffirm what the agent in charge had already done. The proclamation of September 27, 1909, withdrawing oil lands from private acquisition was of far-reaching consequence both to individuals and to the public. It gave rise to much discussion and the old question as to the authority of the President to make these orders was again raised. Various bills were introduced on the subject and the President himself sent a message to Congress calling attention to the existence of the doubt and suggesting the desirability of legislation to expressly grant the power and ratify what had been done. A bill passed the House containing such ratification and authorizing future withdrawals. When the bill came to the Senate it was referred to a committee and, as its members did not agree in their view of the law, two reports were made. The majority, after a review of the practice of the Department, the acquiescence of Congress in the practice and the decisions of the courts, reported that the President already had a general power of withdrawal and recommended the passage of the pending bill inasmuch

as it operated to restrict the greater power already possessed. Sen. Rep. 171 (61st Cong. 2d Session). But having regard to the fact that private persons, on withdrawn land, had raised a question as to the validity of the order and that such question presented a matter for judicial determination, Congress was studious to avoid doing anything which would affect either the public or private rights. It therefore used language which showed not only that the statute was not intended to be retrospective but was not to be construed either as a recognition, enlargement or repudiation of rights like those asserted by Appellees.

In other words, if, notwithstanding the withdrawal, any locator had initiated a right which, however, had not been perfected, Congress did not undertake to take away his rights. On the other hand, if the withdrawal order had been legally made under the existing power, it needed no ratification and if a location made after the withdrawal gave the Appellees no right, Congress, by this statute, did not legislate against the public and validate what was then an invalid location. The act left the rights of parties in the position of these Appellees, to be determined by the state of the law when the proclamation was issued. As heretofore pointed out the long-continued practice, the acquiescence of Congress, as well as the decisions of the courts, all show that the President had the power to make the order. And as was said in *Wolsey* v. *Chapman*, 101 U. S. 769, the "*withdrawal would be sufficient to defeat a settlement . . . while the order was in force. . . .*"

The case is therefore remanded to the District Court with directions that the decree dismissing the Bill be

*Reversed.*

Mr. Justice McReynolds took no part in the decision of this case.

Mr. Justice Day with whom concurred Mr. Justice McKenna and Mr. Justice Van Devanter, dissenting.

This case originated in a bill filed by the United States in the United States District Court for the District of Wyoming to restrain trespasses on a certain tract of public petroleum lands in the State of Wyoming and to obtain an accounting for petroleum claimed to have been wrongfully extracted therefrom. The bill sets up ownership in the United States of the land in question, being a tract of 160 acres, and alleges that the land is chiefly valuable for petroleum; that on September 27, 1909, the tract in controversy in common with many others was withdrawn from mineral exploration and from all forms of location, settlement, selection, filing, entry or disposal under the mineral or nonmineral public land laws of the United States; and that this was done by an order promulgated on that day by the Secretary of the Interior pursuant to the direction of the President. The order listed townships and sections aggregating more than 3,000,000 acres situated in the States of Wyoming and California. The terms of this order, styled "Temporary petroleum withdrawal No. 5," are:

"In aid of proposed legislation affecting the use and disposition of the petroleum deposits on the public domain, all public lands in the accompanying lists are hereby temporarily withdrawn from all forms of location, settlement, selection, filing, entry, or disposal under the mineral or nonmineral public land laws. All locations or claims existing and valid on this date may proceed to entry in the usual manner after field investigation and examination."

It appears from the averments of the bill that the lands were originally located by certain individuals after the order of withdrawal and on March 27, 1910; that they were entered upon, explored and a well drilled, thereby

rendering subject to ready extraction large deposits of petroleum of great value; and that the original claimants caused to be filed and recorded in the records of Natrona County, Wyoming, a certain location certificate evidencing claim and location by them of the land as a petroleum placer-mining claim under and in pursuance of the mining laws of the United States. These parties subsequently assigned their rights to the defendant, The Midwest Oil Company, and certain other persons named. The bill also avers that after the withdrawal order of September 27, 1909, on July 2, 1910, a further order of withdrawal described as "Order of withdrawal. Petroleum reserve No. 8," was made by the President, expressly affirming the order of September 27, 1909.

The law under which the location in question was made (29 Stat. 526) reads:

"That any person authorized to enter lands under the mining laws of the United States may enter and obtain patent to lands containing petroleum or other mineral oils, and chiefly valuable therefor, under the provisions of the laws relating to placer mineral claims."

Under Rev. Stat., § 2329 provision was made for entering and patenting placer mining claims in like manner as vein or lode claims; and by Rev. Stat., § 2319 "all valuable mineral deposits" were opened to exploration and purchase and the lands containing them to occupation and purchase under regulations prescribed by law and according to the local customs or rules of miners.

While the allegations of the bill do not set out all the steps which led up to the President's order of withdrawal of September 27, 1909, we may not only look to its allegations but read them in the light of public documents embodying the history of the transaction, of which we may take judicial notice. On September 27, 1909, the Secretary of the Interior by direction of the President issued the temporary petroleum withdrawal order No. 5, above set forth.

The making of this order was preceded by certain correspondence leading up to it.   On February 24, 1908, the Director of the Geological Survey addressed a letter to the Secretary of the Interior, setting forth his opinion as to the superiority of liquid fuel for the Navy, the inadequacy of the coal supply on the Pacific coast and the fact that the demand for oil was greater than the supply and that but little oil land remained under governmental control and that this was being rapidly patented, and his recommendation that the filing of claims to oil lands in California be suspended in order that the Government might continue the ownership of the valuable supplies of liquid fuel.   On the seventeenth of September, 1909, the Director sent another letter to the Secretary of the Interior, enclosing a copy of his earlier letter, and saying, in substance, that the arguments contained in that letter had been reinforced by the Survey's Conservation Report on the petroleum resources of the United States, which showed that at that time the production exceeded the demand of the trade, and inasmuch as the disposal of the public petroleum lands at nominal prices encouraged overproduction, legislation providing for the sane development of such resources should be enacted.   He also stated that the conservation of the petroleum supply demanded a law providing for the disposal of the oil remaining in the public lands in terms of barrels of oil rather than in acres of land; and further that, considering the use of lubricating oil and of fuel oil for the navy, there was an immediate necessity for conserving a proper supply of petroleum for the Government's use, and he recommended the suspension of the filing of claims to oil lands in California pending legislation on the subject.   He also called attention to the fact that the Commissioner of the General Land Office, acting upon his report classifying certain oil lands in California, had issued instructions withholding such oil lands from agricultural entry pending considera-

tion of legislation. And on the same day the Secretary of the Interior addressed a letter to the President calling his attention to the subject of conservation of the petroleum resources of the public domain, especially with reference to the requirements of the Navy, repeating the substance of the Director's letter and stating that other lands than those mentioned in the Director's letter had also been withdrawn from entry in California, and concluding that legislation was needed which would assure conservation of an adequate supply of petroleum for the Government's needs, but which, he believed, would not interfere with the private development of the California oil pools, and therefore the necessity for temporary withdrawals of the land from entry. Shortly thereafter, on September 26, 1909, the Secretary of the Interior telegraphed to the Acting Secretary from Salt Lake City where he had seen the President, as follows:

"Have conferred with President respecting temporary withdrawals covering oil lands. If present withdrawals permit mining entries being made of such lands wish the withdrawals modified at once to prohibit such disposition pending legislation."

The following day the Acting Secretary telegraphed to the Secretary at Helena, Montana:

"Telegram 26th received. California and Wyoming petroleum withdrawals heretofore made permit mining locations. Following your direction I have temporarily withdrawn from all forms of location and entry 2,871,000 acres in California and 170,000 acres in Wyoming, all heretofore withdrawn for classification. My withdrawal prevents all forms of acquisition in future and holds the land in statu quo pending legislation."

And thereupon the withdrawal order of September 27, 1909, above set forth, was promulgated.

It is to be observed that the lands here in controversy are situated in the State of Wyoming. There was no

suggestion that such lands would ever be needed as a basis of oil supply for the Navy. They were withdrawn solely upon the suggestion that a better disposition of them could be made than was found in the existing acts of Congress controlling the subject.

From this statement it is evident that the first question to be decided concerns the validity of the President's withdrawal order of September 27, 1909, and it is necessary to determine whether that order was within the authority of the President and had the effect to withdraw the land in controversy from location under the mineral land law, or whether, as held in the court below, that order had no force and effect to prevent persons from acquiring rights under the then existing statutes of the United States concerning the subject.

The Constitution of the United States in Article IV, § 3, provides: "The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." In this section the power to dispose of lands belonging to the United States is broadly conferred upon Congress, and it is under the power therein given that the system of land laws for the disposition of the public domain has been enacted. *United States* v. *Gratiot*, 14 Pet. 526, 536–7; *United States* v. *Fitzgerald*, 15 Pet. 407, 421; *Van Brocklin* v. *Tennessee*, 117 U. S. 151, 168; *Wisconsin R. R.* v. *Price County*, 133 U. S. 496, 504. In the last case this court said:

"The Constitution vests in Congress the power to 'dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States.' And this implies an exclusion of all other authority over the property which could interfere with this right or obstruct its exercise."

It is contended on behalf of the Government that the power of the President to make such orders as are here in

question has grown up from the authorization of Congress in its legislation and because of its long sanction by acquiescence in the exercise of such executive authority, so that, if it be admitted that the authority of the President to deal with the public lands must come from Congress, the sanction which such action of the Executive has received in the course of many years of legislation and congressional acquiescence is as effective as though the express authority had been conferred by law. In aid of this argument the general course of legislation is pointed to, and the decisions of this court and opinions of Attorneys General in connection with certain acts are cited. Upon the other hand it is contended that if these acts are to be taken as the general declaration of congressional intent upon the subject, they contain express authorization of the President to make withdrawals when Congress wishes to confer such power. Some of the instances referred to are set out in the margin.[1]

---

[1] The Government asserts that reservations by the Executive for Indian purposes, irrespective of the existence of statutory authority, are found collected in The Public Domain, pp. 727, 1252; 1 Kappler's Laws and Treaties, p. 801; and for military purposes in The Public Domain, pp. 748, 1258; Laws of the United States of a Local and Temporary Character, vol. 2, p. 1171. (Whether or not these orders were preceded by Congressional authority does not definitely appear.) It also recites several executive withdrawals of land for uses related to military purposes, such as lands supplying fuel, water, etc., to military posts, and also a withdrawal to conserve a supply of building stone for harbor improvements. Another instance cited: Where Congress by an appropriation act of June 18, 1878 (20 Stat. 152), had directed the Secretary of War to cause an examination to be made of the sources of the Mississippi River, among others, to determine the practicability and cost of reservoirs for improving its navigation, the Secretary it is said made his report and withdrew certain lands in aid of his report, in the hope that they would be "affected in the event of affirmative congressional action upon said report"; and additional lands were withdrawn subsequently for the same purpose, but after appropriations for the construction of the reservoirs had been made

It is thus explicitly recognized, as was already apparent from the terms of the Constitution itself, that the sole authority to dispose of the public lands was vested in

by the act of June 14, 1880 (21 Stat. 180). Attention is also called to withdrawals for a number of purposes, as to correct surveys; to avoid conflicts with private claims; to prevent frauds; to ascertain character of land, etc., shown by a letter from the Acting Secretary of the Interior, dated March 3, 1902, found at p. 7463 of vol. 45, Congressional Record. The reports of the Secretary of the Interior and the Commissioner of the General Land Office are cited to the effect that supposed oil lands in California were withdrawn from agricultural entry in aid of an investigation of their character and to prevent unlawful application of lieu sections (1900, pp. LI, 75, and 1901, pp. LXIII, 87); that large quantities of coal land were withdrawn to verify the existence of coal deposits because of serious frauds (1907, pp. 13, 251); that temporary reservation was made of the "Petrified Forest" in Arizona for a proposed national park (Commissioner's Report 1900, p. 87); and that temporary withdrawals were made for state parks in California and Michigan (Commissioner's Report, 1902, p. 319), all of which were reported to Congress. The land including the Wind Cave in South Dakota was reserved (Commissioner's Report, 1900, p. 91) and later made a national park by the act of January 9, 1903 (32 Stat. 765). The President had created certain reservations for the protection of birds (Rep. Sec. Int. 1909, p. 43), and subsequently an act was passed making it an offense to interfere with birds or their eggs "on any lands of the United States which have been set apart or reserved as breeding grounds for birds by any law, proclamation, or Executive order" (34 Stat. 536). The Secretary of the Interior had directed that all applications to purchase certain isolated tracts should be suspended (34 L. D. 245), and subsequently an act providing for the disposition of disconnected tracts was approved by Congress (34 Stat. 517). In aid of a bill to authorize Wisconsin to select certain lands, the President withdrew a large area in that State, and the bill was later passed (35 L. D. 11; 34 State. 517). Coal lands in Alaska were withdrawn from entry by direction of the President (35 L. D. 572), which had been thrown open to entry by Congress (33 Stat. 525), and the propriety of this withdrawal was approved by Congress (35 Stat. 424). To support its statement that general recognition of the executive authority is found in a number of statutes the Government cited: The townsite law of March 2, 1867 (14 Stat. 541), which contained a proviso that "the provisions of this act shall not apply to military or other reservations

236 U. S.    DAY, McKENNA, and VAN DEVANTER, JJ., dissenting.

the Congress and in no other branch of the Federal Government. The right of the Executive to withdraw lands which Congress has declared shall be open and free to settlement upon terms which Congress has itself prescribed, is said to arise from the tacit consent of Congress in long acquiescence in such executive action resulting in an implied authority from Congress to make such withdrawals in the public interest as the Executive deems proper and necessary. There is nothing in the Constitution suggesting or authorizing such augmentation of executive authority or justifying him in thus acting in aid of a power which the framers of the Constitution saw

---

heretofore made by the United States, nor to reservations for light-houses, customhouses, mints, or such other public purposes as the interests of the United States may require, whether held under reservations through the land office by title derived from the Crown of Spain, or otherwise"; and the act of February 8, 1887 (24 Stat. 388), providing for the allotment of lands in severalty to Indians on the various reservations and for other purposes, the opening paragraph of which read: "That in all cases where any tribe or band of Indians has been, or shall hereafter be, located upon any reservation created for their use, either by treaty stipulation or by virtue of an act of Congress or executive order setting apart the same for their use, the President of the United States be, and he hereby is, authorized. . . ."

The Government says, however, that "there is no publication which can be relied on in determining whether a given Executive order was preceded by statutory authority," and admits that it is possible that in some of the cases cited there was antecedent statutory authority.

The defendant appends to its brief a list of statutes giving discretionary power to the Executive to make withdrawals, those relating to military or analogous purposes being, 1 Stat. 252; 1 Stat. 352; 1 Stat. 555; 2 Stat. 453; 2 Stat. 547; 2 Stat. 750; 4 Stat. 687; 9 Stat. 500; 10 Stat. 27; 10 Stat. 608; those for Indian purposes being, 4 Stat. 411; 10 Stat. 238; 11 Stat. 401; 12 Stat. 819; 13 Stat. 40; for a lighthouse, 1 Stat. 54; with reference to salt springs, 2 Stat. 235; 2 Stat. 280; 2 Stat. 394; and lead mines, 2 Stat. 449; for town sites, 3 Stat. 375; 12 Stat. 754; for reservoirs, 25 Stat. 526; and irrigation work, 32 Stat. 388; for lands containing timber for naval purposes, 3 Stat. 347; and for forest reserves, 26 Stat. 1103; 30 Stat. 36.

fit to vest exclusively in the legislative branch of the Government.

It is true that many withdrawals have been made by the President and some of them have been sustained by this court, so that it may be fairly said that, within limitations to be hereinafter stated, executive withdrawals have the sanction of judicial approval, but, as we read the cases, in no instance has this court sustained a withdrawal of public lands for which Congress has provided a system of disposition, except such withdrawal was—(a) in pursuance of a policy already declared by Congress as one for which the public lands might be used, as military and Indian reservations for which purposes Congress has authorized the use of the public lands from an early day, or (b) in cases where grants of Congress are in such conflict that the purpose of Congress cannot be known and therefore the Secretary of the Interior has been sustained in withdrawing the lands from entry until Congress had opportunity to relieve the ambiguity of its laws by specifically declaring its policy.

It is undoubtedly true that withdrawals have been made without specific authority of an act of Congress, but those which have been sustained by this court, it is believed, will be found to be in one or the other of the categories above stated. On the other hand, when the executive authority has been exceeded this court has not hesitated to so declare, and to sustain the superior and exclusive authority of Congress to deal with the public lands.

The first decision of this court which has come to our attention in which this matter was dealt with is *Wilcox* v. *Jackson*, 13 Pet. 498, decided in 1839. That case involved a controversy concerning the lands occupied by the military post called Fort Dearborn in Cook County, Illinois. The lands had been used for many years as a military post and an Indian agency, and in 1824 were reserved by

the Commissioner of the General Land Office at the request of the Secretary of War for military purposes. It also appears that prior to May 1, 1834, the Government built a lighthouse on part of the land. When the suit was brought by Jackson to recover them they were in the possession of Wilcox, commander of the post, who claimed the right to hold them as an officer of the United States under the orders of the Secretary of War. The claim asserted by Jackson arose from the preëmption allowed to his lessor's predecessor in title under the act of June 19, 1834 (c. 54, 4 Stat. 678), which revived the act of May 29, 1830 (c. 208, 4 Stat. 420), which provided that "no entry or sale of any land shall be made, under the provisions of this act, which shall have been reserved for the use of the United States, or either of the several states, . . . or which is reserved from sale by act of Congress, or by order of the President, or which may have been appropriated, for any purpose whatsoever." The court, after stating that lands which had been appropriated for any purpose whatsoever were exempt from preëmption and that the lands in question had been in fact appropriated, reviewed legislation authorizing the President to erect fortifications and to establish trading houses and, in concluding that the appropriation had been made by authority of law, said (p. 512):

"We thus see that the establishing [of] trading houses with the Indian tribes, and the erection of fortifications in the west, are purposes authorized by law; and that they were to be established and erected by the President. But the place in question is one at which a trading house has been established, and a fortification or military post erected. It would not be doubted, we suppose, by any one, that if Congress had by law directed the trading house to be established and the military post erected at Fort Dearborn, by name; that this would have been by authority of law. But instead of designating

the place themselves, they left it to the discretion of the President, which is precisely the same thing in effect. Here then is an appropriation, not only for one but for two purposes, of the same place by authority of law. But there has been a third appropriation in this case by authority of law. Congress, by law, authorized the erection of a lighthouse at the mouth of Chicago river, which is within the limits of the land in question, and appropriated $5000 for its erection; and the case agreed states that the lighthouse was built on part of the land in dispute before the 1st of May, 1834. We think, then, that there has been an appropriation, not only in fact but in law."

The court, after remarking that Congress must have known of the authority which had been given to the President by former laws to establish trading houses and military posts and that a military post had long been established at Fort Dearborn, said (p. 514): "They seem therefore to have been studious to use language of so comprehensive a kind, in the exemption from the right of preëmption, as to embrace every description of reservation and appropriation which had been previously made for public purposes."

With reference to the reservation of 1824 the court merely said (p. 512): "We consider this, too, as having been done by authority of law; for amongst other provisions in the act of 1830, all lands are exempted from preemption which are reserved from sale by order of the President." (And the court held that the act of the Secretary of War was that of the Executive.) But the court later laid down the rule that when lands have been legally appropriated, they immediately become severed from the mass of public lands and that no subsequent law or proclamation would embrace them, although no reservation had been made of them. From that case, therefore, the following propositions are deduced: That where there

is a legal appropriation, reservation is unnecessary, but that the reservation in that case had been ratified by a subsequent act of Congress. And that the appropriation of the land in controversy in that case had been by authority of law, *i. e.*, power placed in the President by Congress by acts passed before and after the exertion of such power by the President.

*Grisar* v. *McDowell*, 6 Wall. 363, is another case relied upon. There had been a controversy between the City of San Francisco and the United States with reference to the extent of the pueblo lands belonging to the former, which had been determined by an order of court confirming the title of the City subject to the exception of lands "reserved or dedicated to public uses by the United States" and by the Act of Congress of March 8, 1866 (c. 13, 14 Stat. 4), relinquishing the claim of the United States subject to the reservation in the decree. Grisar, claiming title from the City, sought to recover possession of land which had been reserved by order of the President for public purposes and which was held by the defendant, an officer in the army of the United States, commanding the military department of California, who had entered upon the premises and held them under the order of the Secretary of War as part of the public property of the United States reserved for military purposes. In dealing with the right of the President to make the reservation the court first held that it made no difference whether or not the President possessed sufficient authority to make the reservation, because being a part of the public domain they were excluded from lands affirmed to the State under which the plaintiff claimed. In dealing with the power of the President the court said (6 Wall., p. 381):

"But further than this: from an early period in the history of the government it has been the practice of the President to order, from time to time, as the exigencies of the public service required, parcels of land belonging to

the United States to be reserved from sale and set apart for public uses."

In this connection the court cited acts of Congress recognizing the authority of the President, among others, the preëmption act of May 29, 1830, *supra*, in which it was provided that the right of preëmption should not extend to lands reserved from sale by act of Congress or by order of the President, and the act of September 4, 1841 (c. 16, 5 Stat. 453, 456), exempting lands reserved by any treaty, law or proclamation of the President, and of March 3, 1853 (c. 143, 10 Stat. 244, 246), excepting lands appropriated under authority of the act or reserved by competent authority, and held that this reservation by competent authority meant the authority of the President, and those acting under his direction. Furthermore, the court held that the action of the President in making the reservations had been indirectly approved by Congress by appropriating moneys for the construction of fortifications and other public works upon them, and that the reservations embraced lands upon which public buildings had been erected. The language of Mr. Justice Field above quoted as to the authority of the President has been frequently quoted in subsequent opinions of Attorneys General, and has been made the basis of opinions for broad authority in the President. It is to be observed, however, that in that case the law, recited in the opinion as giving the power of reservation, contained congressional authority directly to the President or competent authority, which it was held meant the President, and the statement was added that the action of the President had been approved by Congress appropriating money for fortifications and other public works.

The Government also relied upon a series of cases in this court which may be called the *Des Moines River Cases*, beginning with *Wolcott* v. *Des Moines Co.*, 5 Wall. 681, and followed by *Riley* v. *Welles*, 154 U. S. 578; *Williams* v.

*Baker,* 17 Wall. 144; *Homestead Co.* v. *Valley Railroad,* 17 Wall. 153; *Wolsey* v. *Chapman,* 101 U. S. 755; *Litchfield* v. *Webster County,* 101 U. S. 773; *Dubuque & Pac. R. R.* v. *Des Moines Valley R. R.,* 109 U. S. 329; *Bullard* v. *Des Moines &c. R. R.,* 122 U. S. 167; *United States* v. *Des Moines Nav. &c. Co.,* 142 U. S. 510.   In the original case, 5 Wall. 681, it is shown that the cases grew out of an act of Congress of August 8, 1846 (c. 103, 9 Stat. 77), granting to the then Territory of Iowa for the purpose of aiding it in improving the navigation of the Des Moines River from its mouth to the Raccoon Fork, "one equal moiety, in alternate sections, of the public lands, in a strip five miles in width on each side of said river."  This ambiguous description gave rise to the controversy which appeared from time to time in the cases mentioned and arose from the doubt whether the grant to Iowa included lands above the Raccoon Fork.   Early in the year 1848 the Commissioner of the General Land Office decided that the grant extended beyond Raccoon Fork, but later in that year the President by proclamation ordered the sale of some of this land above the Fork in the following October.   On June 16, 1849, however, the Secretary of the Treasury, having construed the grant to include the lands above the Fork, directed that they should be reserved from the sale.   The control of the General Land Office having passed to the Secretary of the Interior, on April 6, 1850, he reversed the decision of the Secretary of the Treasury, but directed that the lands embraced within the State's selections should be reserved from sale.   The matter was before two Presidents and their cabinets, with different results, and finally, on October 29, 1851, the Secretary of the Interior held that in view of the great conflict among executive officers of the Government and in view of the opinion of eminent jurists which had been presented to him in favor of the construction contended for by the State, he was willing to recognize the claim of the

State and approve the selections, without prejudice to the rights, if any there be, of other parties.   The history of subsequent legislation, not necessary to now recite, is given in the opinion, and then the act of May 15, 1856 (c. 28, 11 Stat. 9), upon which the plaintiff relied was considered, in which was found the provision that "any and all lands heretofore reserved to the United States by any act of Congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement, or for any other purpose whatsoever," were reserved from the operation of the act.   This was a grant made to the railroads which it was admitted covered the tract in controversy, unless excluded by the proviso.   It was held that the lands had been reserved by competent authority, the court saying (5 Wall., p. 688):

"It has been argued that these lands had not been reserved by competent authority, and hence that the reservation was nugatory.   As we have seen, they were reserved from sale for the special purpose of aiding in the improvement of the Des Moines River—first, by the Secretary of the Treasury, when the Land Department was under his supervision and control, and again by the Secretary of the Interior, after the establishment of this department, to which the duties were assigned, and afterwards continued by this department under instructions from the President and Cabinet.   Besides, if this power was not competent, which we think it was ever since the establishment of the Land Department, and which has been exercised down to the present time, the grant of 8th August, 1846, carried along with it, by necessary implication, not only the power, but the duty, of the Land Office to reserve from sale the lands embraced in the grant.   Otherwise its object might be utterly defeated.   Hence, immediately upon a grant being made by Congress for any of these public purposes to a State, notice is given by the commissioner of the land office to the registers and receivers to

stop all sales, either public or by private entry. Such notice was given the same day the grant was made, in 1856, for the benefit of these railroads. That there was a dispute existing as to the extent of the grant of 1846 in no way affects the question. The serious conflict of opinion among the public authorities on the subject made it the duty of the land officers to withhold the sales and reserve them to the United States till it was ultimately disposed of."

It is therefore apparent that this reservation was sanctioned, because it had become the duty of the officers, who were by law charged with the administration of the grants and required to give effect to them, to withhold the lands from sale and reserve them because of the doubt of the extent of the grant of 1846. In other words, if the lands had been granted to the State of Iowa, it could not possibly have been the intention of Congress to subject them to selection or grant under other laws, and this court said that the power to reserve them arose by necessary implication from the grant of 1846.

In *Riley* v. *Welles, supra,* involving a claim of title under the preëmption section of the act of September 4, 1841, to land covered by the withdrawal under the act of 1846, this court followed *Wolcott* v. *Des Moines Co., supra,* and repeated its decision as to the effect of the reservation.

In *Williams* v. *Baker,* 17 Wall. 144, and *Homestead Co.* v. *Valley Railroad,* 17 Wall. 153, both involving title to lands claimed under the grant of 1856, as against titles founded on the 1846 act, as did the *Wolcott Case,* the court affirmed the validity of the reservation under the act of 1846, for the reason that the proviso in the act of 1856 prevented the railroad from acquiring the land.

In *Wolsey* v. *Chapman,* 101 U. S. 755, where the controversy was, whether the grant to the Territory of Iowa, by the act of September 4, 1841, *supra,* of the right to select a quantity of lands for internal improvement pur-

poses, excepting such as were or might be "reserved from sale by any law of Congress or proclamation of the President," permitted the selection of certain lands covered by the reservation in these cases, it was held (pp. 768–9):

"They were reserved also in consequence of the act of 1846. The proper executive department of the government had determined that, because of doubts about the extent and operation of that act, nothing should be done to impair the rights of the State above the Raccoon Fork until the differences were settled, either by Congress or judicial decision. For that purpose an authoritative order was issued, directing the local land-officers to withhold all the disputed lands from sale. This withdrew the lands from private entry, and, as we held in *Riley* v. *Wells*, was sufficient to defeat a settlement for the purpose of preemption while the order was in force, notwithstanding it was afterwards found that the law, by reason of which this action was taken, did not contemplate such a withdrawal.

\* \* \* \* \* \* \* \*

"The truth is, there can be no reservation of public lands from sale except by reason of some treaty, law, or authorized act of the Executive Department of the government."

*Litchfield* v. *Webster County, supra,* involved the question as to whether the title to the lands above the Fork vested in the State by the act of 1846, for purpose of taxation, and, affirming the previous cases, the court held that the action of the Executive Department of the General Government reserved the land above the Fork so that it "did not pass to the State when selected as school lands under the act of 1841, or as railroad lands by the grant of 1856, and were not open to preëmption entry," and the Executive order "simply retained the ownership in the United States."

The case of *Dubuque &c. R. R.* v. *Des Moines Valley*

*R. R., supra,* also involved a controversy as to whether title vested under the river or railroad grant, and the court held that the validity of the reservation was no longer an open question.

The history of the matter was restated in *Bullard* v. *Des Moines &c. R. R., supra,* it being made to appear especially that the order withdrawing the land was in effect during all the time up to the passage of the act of July 12, 1862 (c. 161, 12 Stat. 543), and that after the decision in the case of *Dubuque & Pacific R. R.* v. *Litchfield,* 23 Howard, 66, had determined that Congress had not by the act of 1846 granted the land above the Fork to Iowa, the Commissioner of the General Land Office by notice of May 18, 1860, continued the reservation, notwithstanding the decision just referred to. And it was held that the resolution of Congress of March 2, 1861 (12 Stat. 251), did not end the reservation and that claims inaugurated after that resolution and before the passage of the act of July 12, 1862 were subject to the reservation. The court said (122 U. S., p. 170):

"This court has decided in a number of cases, in regard to these lands, that this withdrawal operated to exclude from sale, purchase, or preëmption all the lands in controversy, and unless the case we are about to consider constitutes an exception, it has never been revoked.

\*     \*     \*     \*     \*     \*     \*     \*

"During all this controversy there remained the order of the Department having control of the matter, withdrawing all the lands in dispute from public sale, settlement or preëmption. This withdrawal was held to be effectual against the grant made by Congress to the railroad companies in 1856, because that act contained the following proviso:

"'That any and all lands heretofore reserved to the United States, by any act of Congress, or in any other manner by competent authority, for the purpose of aid-

ing in any object of internal improvement, or for any other purpose whatsoever, be, and the same are hereby, reserved to the United States from the operation of this act, except so far as it may be found necessary to locate the routes of said railroads through such reserved lands, in which case the right of way only shall be granted, subject to the approval of the President of the United States.'"

The court quoted the notice of the Commissioner of the General Land Office of May 18, 1860, that the land above the Fork "which has been reserved from sale heretofore on account of the claim of the State thereto, will continue reserved, for the time being, from sale or from location, by any species of script or warrants, notwithstanding the recent decision of the Supreme Court against the claim.  This action is deemed necessary to afford time for Congress to consider, upon memorial or otherwise, the case of actual *bona fide* settlers holding under titles from the State, and to make such provision, by confirmation or adjustment of the claims of such settlers, as may appear to be right and proper."  And the court said (p. 173):

"It will thus be seen that, notwithstanding the decision of the Supreme Court of the United States in the winter of 1860, the land office determined that the reservation of these lands should continue for the purpose of securing the very action by Congress which the State of Iowa was soliciting, and it is not disputed by counsel for the appellant in this case that this was a valid continuation of such reservation and that during its continuance the preemptions under which the plaintiff claims could not have been made. . . .

"We do not think the joint resolution had the effect to end the reservation of these lands from public entry. . . .

"This is not the way in which a reservation from sale or preëmption of public lands is removed.  In almost

every instance, in which such a reservation is terminated, there has been a proclamation by the President that the lands are open for entry or sale, and in most instances they have first been offered for sale at public auction. It cannot be seen, from anything in the joint resolution, that Congress either considered the controversy ended or intended to remove the reservation instituted by the Department. Its immediate procedure at the next session to the full consideration of the whole subject shows that it had not ceased to deal with it; that the reason for this withdrawal or reservation continued as strongly as before, and it cannot be doubted that the subject was before Congress, as well as before its committees, and that the act of July 12, 1862, was, for the first time, a conclusion and end of the matter so far as Congress was concerned."

The last of the *Des Moines River Cases, United States v. Des Moines &c. Co., supra,* was a suit instituted by the United States to quiet its title to certain of the lands conveyed by the State of Iowa to the Navigation Company and others, claiming that the trust had not been performed, and, after reviewing the history of the matter and the previous cases at considerable length, the court again stated the effect of the reservation (142 U. S., p. 528):

"The validity of this reservation was sustained in the case of *Wolcott* v. *Des Moines Company,* 5 Wall. 681, decided at December term, 1866. In that case it was held that, even in the absence of a command to that effect in the statute, it was the duty of the officers of the Land Department, immediately upon a grant being made by Congress, to reserve from settlement and sale the lands within the grant; and that, if there was a dispute as to its extent, it was the duty to reserve all lands which, upon either construction, might become necessary to make good the purposes of the grant. This ruling as to the power

· and duty of the officers of the Land Department has since been followed in many cases. *Bullard* v. *Des Moines & Fort Dodge Railroad*, 122 U. S. 167, and cases cited in the opinion."

In the case now before us Congress in the statutes referred to had expressly subjected these lands to the operation of the placer mining law and had authorized their exploration for oil and their location, entry and purchase as mineral lands. Congress had in this way exercised its power and manifested its will and such was the situation when the withdrawal in question was made. Deriving the aim of the Executive from the various documents to which we have referred it may be fairly deduced that the prevailing purpose (and that was the sole purpose so far as the lands here involved were concerned) in making the withdrawal was to anticipate that Congress, having the subject-matter brought to its attention, might and would provide a better and more economical system for the disposition of such public lands, and secondarily to preserve some of the oil lands in California as a basis of naval supply in the future, the latter purpose not at that time declared or recognized by Congress. For these purposes the President had no express authority from Congress; in fact, such is not claimed. The authority which may arise by implication, we think, must be limited to those purposes which Congress has itself recognized by either direct legislation or long continued acquiescence as public purposes for which such withdrawals could be made by the Executive. That the President might by virtue of his executive authority take action to preserve public property or in aid of the execution of the laws reserve tracts of land for definitely fixed public purposes, declared by Congress, such as military or Indian reservations, may be conceded; but we are unable to find sanction for the action here taken in withdrawing a large part of the public domain from the operation of the public land laws in the

power inherent in this office as created and defined by the Constitution or in any way conferred upon him by the legislation of Congress or in that long acquiescence in the exercise of authority sanctioned by Congress in such manner as to be the equivalent of a grant to the President.

The constitutional authority of the President of the United States (Art. II, §§ 1, 3), includes the executive power of the Nation and the duty to see that the laws are faithfully executed. "The President 'shall take care that the laws be faithfully executed.' Under this clause his duty is not limited to the enforcement of acts of Congress according to their express terms. It includes 'the rights and obligations growing out of the Constitution itself, our international relations, and all the protection implied by the nature of the government under the Constitution.'" Cooley's Principles of Constitutional Law, p. 121; *In re Neagle*, 135 U. S. 1. The Constitution does not confer upon him any power to enact laws or to suspend or repeal such as the Congress enacts. *Kendall* v. *United States*, 12 Pet. 524, 613. The President's powers are defined by the Constitution of the United States, and the Government does not contend that he has any general authority in the disposition of the public land which the Constitution has committed to Congress, and freely concedes the general proposition as to the lack of authority in the President to deal with the laws otherwise than to see that they are faithfully executed.

As we have said, while this court has sustained certain withdrawals made by the Executive, in carrying out a policy for which the use of the public lands had been indicated by congressional legislation, and has sustained the right of withdrawal where conflicting grants had been made by Congress and additional legislation was needed to expressly declare the purpose of Congress, the court has refused to sustain withdrawals made by the Executive branch of the Government when in contravention of the

policy for the disposition of the lands declared in acts of Congress. In *Southern Pacific R. R.* v. *Bell*, 183 U. S. 675, it was held that the Secretary of the Interior had no authority to withdraw lands within the indemnity limits of a grant from sale or preëmption, when Congress had indicated its purpose that such lands might be taken up by settlers before the road had exercised its right of selection. In *Brandon* v. *Ard*, 211 U. S. 11, the conflict was between an attempted withdrawal in aid of a land grant and a homestead settlement three years later, and this court held that the withdrawal of the lands from sale or settlement prior to the definite location of the road, and before they were selected to supply deficiencies in place or granted limits, was without authority of law, and that the homestead settlement, under existing laws of Congress, must prevail over such attempted withdrawal. The same principle was declared and enforced in *Osborn* v. *Froyseth*, 216 U. S. 571.

In *Lockhart* v. *Johnson*, 181 U. S. 516, 520, Mr. Justice Peckham, speaking for the court, tersely stated the rule:

"Public lands belonging to the United States, for whose sale or other disposition Congress has made provision by its general laws, are to be regarded as legally open for entry and sale under such laws, unless some particular lands have been withdrawn from sale by Congressional authority or by an executive withdrawal under such authority, either expressed or implied."

We think the rule thus stated is the result of the previous decisions of this court, when properly construed, and is consistent with the authority over the public lands given to Congress under the Constitution, and properly rests with the executive power to deal with such lands by way of withdrawal upon the express or implied authority of the Congress. In other words, it may be fairly said that a given withdrawal must have been expressly authorized by Congress or there must be that clear implication of

congressional authority which is equivalent to express authority; and when such authority is wanting there can be no executive withdrawal of lands from the operation of an act of Congress which would otherwise control.

The message of the President of January 14, 1910, indicates that he doubted his authority to make such withdrawals. In that message, after referring to the lax manner in which the Government had been disposing of the public lands under the mining and other acts and the need of properly classifying lands and revising the mode of disposing of the oil and other deposits in them with greater regard to the public interests, but without hindering development, he said:

"The power of the Secretary of the Interior to withdraw from the operation of existing statutes tracts of land, the disposition of which under such statutes would be detrimental to the public interest, is not clear or satisfactory. This power has been exercised in the interest of the public with the hope that Congress might affirm the action of the executive by laws adapted to the new conditions. Unfortunately, Congress has not thus far fully acted on the recommendations of the Executive, and the question as to what the Executive is to do is, under the circumstances, full of difficulty. It seems to me that it is the duty of Congress now by statute to validate the withdrawals that have been made by the Secretary of the Interior and the President, and to authorize the Secretary of the Interior temporarily to withdraw lands pending submission to Congress of recommendations as to legislation to meet conditions or emergencies as they arise. . . .

"I earnestly recommend that all the suggestions which he [the Secretary of the Interior] has made with respect to these lands shall be embodied in statutes, and, especially, that the withdrawals already made shall be validated so far as necessary and that the authority of the Secretary of the Interior to withdraw lands for the pur-

pose of submitting recommendations as to future disposi-
tions of them where new legislation is needed shall be
made complete and unquestioned."

After the receipt of this message a considerable number
of bills being before the Senate and House of Representa-
tives upon the subject, the matter was taken up and in the
House of Representatives a bill was passed providing for
withdrawals under certain conditions and providing that
"All withdrawals heretofore made and now existing are
hereby ratified and confirmed as if originally made under
this act." The bill in that form did not pass the Senate.
It was, however, adopted in a materially modified form in
the act of June 25, 1910 (c. 421, 36 Stat. 847); which reads:

"Be it enacted by the Senate and House of Representa-
tives of the United States of America in Congress assem-
bled, That the President may, at any time in his discre-
tion, temporarily withdraw from settlement, location,
sale, or entry any of the public lands of the United States
including the District of Alaska and reserve the same for
water-power sites, irrigation, classification of lands, or
other public purposes to be specified in the orders of with-
drawals, and such withdrawals or reservations shall remain
in force until revoked by him or by an Act of Congress.

"Sec. 2. That all lands withdrawn under the provisions
of this Act shall at all times be open to exploration, dis-
covery, occupation, and purchase, under the mining laws
of the United States, so far as the same apply to minerals
other than coal, oil, gas, and phosphates: Provided, That
the rights of any person who, at the date of any order of
withdrawal heretofore or hereafter made, is a bona fide
occupant or claimant of oil or gas bearing lands, and who,
at such date, is in diligent prosecution of work leading to
discovery of oil or gas, shall not be affected or impaired by
such order, so long as such occupant or claimant shall
continue in diligent prosecution of said work: And pro-
vided further, That this act shall not be construed as a

recognition, abridgment, or enlargement of any asserted rights or claims initiated upon any oil or gas bearing lands' after any withdrawal of such lands made prior to the passage of this Act: And provided further, That there shall be excepted from the force and effect of any withdrawal made under the provisions of this Act all lands which are, on the date of such withdrawal, embraced in any lawful homestead or desert-land entry theretofore made, or upon which any valid settlement has been made and is at said date being maintained and perfected pursuant to law; but the terms of this proviso shall not continue to apply to any particular tract of land unless the entryman or settler shall continue to comply with the law under which the entry or settlement was made.   And provided further, That hereafter no forest reserve shall be created, nor shall any additions be made to one heretofore within the limits of the States of Oregon, Washington, Idaho, Montana, Colorado or Wyoming, except by Act of Congress.

"SEC. 3. That the Secretary of the Interior shall report all such withdrawals to Congress at the beginning of its next regular session after the date of the withdrawals."

The reports of the Senate Committee show that its members were divided as to the authority of the President to make the withdrawal order in question.   The majority report stated that in any view the President had the authority without additional legislation; the minority reached the opposite conclusion.

It is to be noted that the act of June 25, 1910, conferred specific authority for the future upon the President, but gave no approval to the withdrawal of September 27, 1909, containing instead an express provision that the act should not be construed as a recognition, abridgment, or enlargement of any asserted rights or claims initiated upon any oil or gas bearing lands after the withdrawal of such lands made prior to the passage of the act.   While the order of

September 27, 1909, withdrew the lands from all form of settlement, location, sale, entry or disposal under the mineral or nonmineral public land laws, the act of June 25, 1910, excepts from the power of withdrawal conferred upon the President lands embraced in any lawful homestead or desert-land entry theretofore made or upon which any valid settlement had been made and was being maintained and perfected pursuant to law. Furthermore, the act provides that the rights of a bona fide occupant or claimant of oil or gas bearing lands complying with the provisions of the statute relating thereto shall not be affected or impaired by a subsequent order of withdrawal. In this statute there certainly is no congressional assent to the executive withdrawal of September 27, 1909. The validation or ratification asked in the President's message was withheld and only restricted authority for the future was granted in the act of June 25, 1910; not only so, but the rights of the locators involved in this case were preserved to whatever extent they existed in the absence of a ratification of the withdrawal. When express ratification is thus asked and refused, in our view no power by implication can be fairly inferred. *Barden* v. *Northern Pacific Railroad*, 154 U. S. 288, 317; *Duroursseau* v. *The United States*, 6 Cranch, 307, 318; *Eyster* v. *Centennial Board of Finance*, 94 U. S. 500, 503. The act of June 25, 1910, neither ratified the withdrawal of September 27, 1909, nor empowered the President so to do by his order of July 2, 1910.

The Government of the United States is one of limited powers. The three coördinate branches of the Government are vested with certain authority, definite and limited, in the Constitution. This principle has often been enforced in decisions of this court, and the apt words of Mr. Justice Miller, speaking for the court in *Kilbourn* v. *Thompson*, 103 U. S. 168, 190, have been more than once quoted with approval:

"It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers intrusted to government, whether State or National, are divided into the three grand departments, the executive, the legislative, and the judicial. That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other."

These principles ought not to be departed from in the judicial determinations of this court, and their enforcement is essential to the administration of the Government, as created and defined by the Constitution. The grant of authority to the Executive, as to other departments of the Government, ought not to be amplified by judicial decisions. The Constitution is the legitimate source of authority of all who exercise power under its sanction, and its provisions are equally binding upon every officer of the Government, from the highest to the lowest. It is one of the great functions of this court to keep, so far as judicial decisions can subserve that purpose, each branch of the Government within the sphere of its legitimate action, and to prevent encroachments of one branch upon the authority of another.

In our opinion, the action of the Executive Department in this case, originating in the expressed view of a subordinate official of the Interior Department as to the desirability of a different system of public land disposal than that contained in the lawful enactments of Congress,

did not justify the President in withdrawing this large body of land from the operation of the law and virtually suspending, as he necessarily did, the operation of that law, at least until a different view expressed by him could be considered by the Congress. This conclusion is reinforced in this particular instance by the refusal of Congress to ratify the action of the President, and the enactment of a new statute authorizing the disposition of the public lands by a method essentially different from that proposed by the Executive.

For the reasons expressed, we are constrained to dissent from the opinion and judgment in this case.